# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Jones*, 2012 IL App (2d) 110346

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE R. JONES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0346 |
| Filed | December 19, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for aggravated battery of a police officer, the trial court did not abuse its discretion in amending the indictment to correctly name the officer who was the victim, since defendant was not surprised or prejudiced and the amendment was formal, and defendant's counsel was not ineffective in failing to strike a biased juror or in waiting until surrebuttal to call defendant's girlfriend as a witness, because defendant did not overcome the presumption that his counsel's decisions were matters of trial strategy. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 08-CF-2933; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas A. Lilien and Christopher McCoy, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Hudson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1   Following a jury trial, defendant, George R. Jones, was convicted of aggravated battery (720 ILCS 5/12-4(a) (West 2008)) and sentenced to 4½ years' imprisonment. In this direct appeal, defendant argues that: (1) the State improperly amended the indictment on the first day of trial and (2) his trial counsel was ineffective for failing to strike a juror and for waiting until surrebuttal to call a witness, who was not allowed to testify. We affirm.

¶ 2                     I. BACKGROUND

¶ 3                       A. Pretrial

¶ 4                      1. Indictment

¶ 5   A transcript of the grand jury proceedings on October 16, 2009, is part of the record. The transcript reflects that the State asked the grand jury to return a three-count indictment: "count one, disarming a peace officer; count two, aggravated battery; count three, resisting a peace officer." Carpentersville police detective Paul Brandt, who was not present during the incident involving defendant, was the only witness to testify. Detective Brandt's testimony was based on his review of police reports.

¶ 6   According to the reports, Officers Joseph Gutierrez, Edward Acot, and Robert Drews were dispatched to a reported domestic disturbance at Foxview Apartments on October 15, 2008, around 11:15 p.m. Defendant was being belligerent and not allowing his girlfriend, Amanda Perkins, to speak with the officers. The officers advised defendant that they needed to make sure Amanda was all right. Defendant replied that she was fine and denied them access into the apartment. Officer Gutierrez asked defendant to step outside of the apartment to talk. Defendant refused to exit and stated that Officer Gutierrez could come inside if he took off his vest, gun, and belt. After Officer Gutierrez told defendant that that was not going to happen, defendant reached out and grabbed Officer Gutierrez's arm. Officer Gutierrez told defendant not to grab him and that he was under arrest. Officer Gutierrez reversed defendant's grip on his arm, and Officers Drews and Gutierrez tried to lift defendant through

the door to place him under arrest. Defendant fought the whole way and grabbed Officer Acot's gun and tried to unholster it. Defendant continued to fight with the officers and was taken to the ground and tased.

¶ 7    The grand jury returned a three-count indictment charging defendant with disarming a peace officer, aggravated battery, and resisting a peace officer. All three counts identified Officer Acot as the victim. The disarming count alleged that defendant knowingly disarmed or attempted to disarm Officer Acot by taking or attempting to take his firearm. The aggravated battery count alleged that defendant knowingly made contact of an insulting or provoking nature with Officer Acot in that he struck him about the body. The resisting count alleged that defendant knowingly resisted his arrest in that he struck and resisted Officer Acot.[1]

¶ 8    A jury trial commenced on July 12, 2010. On the day of trial, the State advised the court that, the night before, it had become aware that the aggravated battery count contained a "scrivener's error." Although that count referred to Officer Acot as the victim, the grand jury transcript testimony and police reports indicated that defendant committed the aggravated battery against Officer Gutierrez. The amended count alleged that defendant knowingly made contact of an insulting nature with Officer Gutierrez in that he struck him about the body.

¶ 9    Defense counsel responded to the State's motion by arguing as follows. Changing the victim's name did not constitute correcting a scrivener's error or a formal defect; instead, it amounted to a "material change" to the indictment. Officer Acot was known to have been involved in the arrest yet the State waited two years, until the day of trial, to change the name of the victim. At this point, the court asked defense counsel whether he agreed that the grand jury transcript set forth Officer Gutierrez as the victim. Defense counsel replied that the grand jury transcript set forth allegations concerning both Officers Gutierrez and Acot. However, he argued, the aggravated battery charge of insulting or provoking contact could be "anything," even breathing on the officer in an insulting or provoking way. Defense counsel reiterated that the name of the victim could not be changed on the day of trial.

¶ 10    The court allowed the amendment for two reasons: first, defense counsel's acknowledgment that there was reference to Officer Gutierrez in the grand jury transcript; and second, the liberal case law regarding "how late in the proceedings" the State is allowed to move for such an amendment. Nevertheless, the court gave defense counsel the option of a continuance if the amendment was a surprise in terms of his trial strategy. Defense counsel asked the court to clarify whether it was ruling that the amendment addressed a formal defect in the indictment, to which the court responded affirmatively. Defense counsel then conferred with defendant and opted to proceed to trial.

¶ 11                                    2. Jury Selection

¶ 12    During *voir dire*, one of the potential jurors, Jolynn Williams, stated that her uncle had been a police officer. When defense counsel asked if she would give more credibility to a

---

[1]Prior to trial, the State nol-prossed the resisting arrest count.

police officer's testimony than defendant's testimony, she said she would. Defense counsel then questioned another potential juror, Jerry Glees, and the following colloquy occurred.

"Q. And again, I understand all of us are favor–or very favorable, may have very favorable experiences with police officers, I'm not saying anything bad about a police officer but would you give a police officer any more credibility, his testimony, right off Jump Street?

A. I think I would, just because being taught that they're to uphold the law and they're to be honest and credible witnesses.

Q. Now anything an officer said, would you just assume that that is true?

A. I would not say that I might assume it, I would like to think that I would listen to all of the facts and make a decision bassed [*sic*] on that.

Q. You said that you would like to think?

A. Well, I would have to go through the trial and see what happens. I'm just saying that police officers are–they're to uphold the law and [*sic*] gives them credence.

Q. Just like all of us here?

A. Yes.

Q. So you are more likely to give credibility after the fact, would you say that you would be more likely to give a police officer's testimony than any other citizen?

A. I am saying I would believe they would be more credible.

Q. Okay."

Immediately after this exchange, a sidebar conference occurred. Defense counsel indicated that he was "going to show cause," and the court stated that it would ask some follow-up questions. To Williams (and not Glees), the court noted that she was related to a police officer and believed an officer's testimony to be "most credible." The court asked if she could be fair and impartial in this case, and she said no. The court excused Williams for cause and told defense counsel to continue. Defense counsel said, "Oh, I guess–I'm sorry," and then began questioning the replacement juror. The replacement juror and Glees were accepted as jurors in the next panel. During the remainder of jury selection, defense counsel excused one more juror on a peremptory challenge.

¶ 13                                                    B. Trial

¶ 14        During opening argument, the State maintained that defendant was drunk, belligerent, and refusing to let the police officers check on Amanda. When the officers asked him to step outside of his apartment, defendant refused, telling Officer Gutierrez to take off his vest, gun, and belt and come inside and fight him. Officer Gutierrez refused, and defendant grabbed the officer's arm and attempted to pull him into the apartment. As Officer Acot tried to help Officer Gutierrez free himself from defendant's grip, defendant grabbed at Officer Acot's gun. Officer Acot then shouted to Officer Drews, who helped get defendant to the ground. Defendant continued to struggle and grab at Officer Acot's gun, until he was tased and handcuffed.

-4-

¶ 15    Defense counsel countered the State's theory by arguing as follows. The officers asked Amanda, "the woman that [the jury] will be hearing from," if she was fine, and she said yes. The officers shined a flashlight on her and saw no bruises or marks. Yet, they still wanted to come inside defendant's apartment. So, they grabbed defendant from inside of his home and dragged him through the top of the screen door, which was possible because the screen was not intact with the door. Defense counsel explained that defendant did not commit the offenses he was charged with; all of the violence came from the officers. He also argued that the officers had to justify their use of a Taser even though no charges were pending against defendant at the time they questioned him. Defense counsel continued that the jury would hear the officers testify and "hear from Amanda" and "probably" from defendant to see what happened in the case.

¶ 16    Officer Gutierrez testified first, on behalf of the State. Officer Gutierrez had been employed as a police officer by the Village of Carpentersville for four years and was on patrol the night of the incident. He was dispatched to defendant's apartment around 11 p.m. regarding a possible disturbance. Officers Acot and Drews and two personnel from Fox Valley security were also at the scene. Defendant's apartment was partly underground with stairs leading down to the front door. The officers knocked on the door, and defendant eventually appeared.

¶ 17    Officer Gutierrez described defendant's demeanor as belligerent. The officers told defendant that they were there to make sure Amanda was okay. Defendant, shirtless and smelling of alcohol, replied that Amanda was fine and refused to let the officers inside the apartment. At this point, Amanda came and stood behind defendant. It was dark, and Officer Gutierrez could not see her even when using his flashlight, although he could hear her. Defendant was yelling at the officers, telling Officer Gutierrez that he was " 'in shit' " and did not have a right to be there.

¶ 18    The front door was open and defendant was standing behind the screen door. He was poking his head and upper torso out of the screen, which was not intact with the door. Defendant said that Officer Gutierrez could come inside if he removed his vest, gun, and belt, but Officer Gutierrez said that that was not going to happen. Defendant did not directly mention fighting, but that was what Officer Gutierrez inferred. As Officer Gutierrez explained that they wanted simply to make sure Amanda was all right, defendant reached out through the screen and grabbed his left arm. Officer Gutierrez was "startled, stunned." Officer Gutierrez told defendant that defendant was not allowed to touch him, and he reversed the grip, putting defendant in a wrist lock and pulling him forward. Defendant began to fall forward through the screen door. Officer Gutierrez tried to hold defendant back with defendant's other arm, and Officer Acot tried to assist in bringing defendant down to the ground. Defendant continued to fight.

¶ 19    Officer Drews then came down the stairs and tried to lift up defendant's legs so that they would come through the screen. At this point, Officer Acot yelled that defendant had grabbed for his gun and was pulling at it. Defendant was told to stop resisting and eventually Officer Drews used a Taser. Defendant was handcuffed and taken to the police station. When defendant asked why he was under arrest, Officer Gutierrez told him he was being arrested for aggravated battery, based on contact with Officer Gutierrez, and resisting arrest.

¶ 20 On cross-examination, Officer Gutierrez testified that he told defendant that the officers needed to come inside his apartment to make sure Amanda was all right. When he asked if Amanda was all right, she answered that she was okay. At this point, Officer Gutierrez shined his flashlight in the apartment and could see "parts" of Amanda. The officers did not leave and continued to investigate what was going on. Officer Gutierrez had been trained how to deal with drunk and belligerent people. Still, he was "shocked" when defendant grabbed his arm. Officer Gutierrez reversed the grip, and Officer Acot grabbed defendant by the waist to get him through the doorway. Defendant's feet were still inside his apartment but he was leaning outside of the doorway. Then, the screen door opened and defendant's legs were suspended in the air. Officer Drews tried to grab defendant's legs. When all three officers had different parts of defendant's body, and he was suspended in the air, he grabbed at Officer Acot's gun. Officer Gutierrez admitted that he did not know defendant's intentions behind this action. Eventually, defendant was brought to the ground. None of the officers were injured.

¶ 21 On redirect, Officer Gutierrez testified that defendant was under arrest right after he touched the officer's arm; no injury was required for an arrest. When defendant told him to remove his equipment, his tone was suggestive, "like we were going to fight." In addition, even though Amanda said she was okay, her voice was quivering and she seemed like she was afraid.

¶ 22 On recross, Officer Gutierrez admitted that he could not see defendant's hand on Officer Acot's gun. He also said that defendant was still grabbing at Officer Acot's gun from the ground and that defendant was not committing a crime and was not under arrest until he grabbed Officer Gutierrez's arm.

¶ 23 Officer Acot, who had also served on the police force for four years, testified next as follows. For the most part, his testimony was consistent with that of Officer Gutierrez. After defendant grabbed Officer Gutierrez, and Officer Gutierrez reversed the grip, defendant was under arrest. Defendant tried to stay in his apartment but Officer Acot assisted in pulling defendant out because he was resisting arrest. At this time, Officer Acot felt a tug on his duty holster and saw defendant's left hand on his weapon, which was located on his right side. Defendant's hand clamped down directly on top of his gun grip. To minimize defendant's movement, Officer Acot used his hands to press down on defendant's left hand and grab his left forearm. After that, Officer Acot placed his left arm around defendant's head and told the other officers that defendant was attempting to take his gun. Officer Drews then lifted defendant's legs through the door. Defendant's hand remained on Officer Acot's weapon until he was tased.

¶ 24 On cross-examination, Officer Acot testified that defendant told Officer Gutierrez to take off his equipment and come inside so that they could fight; defendant used the words " 'to fight him.' " The officers asked defendant several times whether they could come inside. Officer Acot never heard Amanda say that she was okay. He could see her in the background; she did not appear injured. After Officer Gutierrez reversed defendant's grip on his arm, he continued to hold defendant's arm, and defendant used his other hand to try to grab Officer Acot's gun. Officer Acot never grabbed defendant's torso; he used his right hand to prevent defendant from taking his gun and then his left arm went around defendant's head.

¶ 25    Kalim Khan, a security guard at Foxview Apartments, testified consistently with Officers Gutierrez and Acot with one exception. Khan testified that defendant grabbed Officer Gutierrez twice. Officer Gutierrez warned defendant the first time he did it, and the second time he told defendant he was under arrest for grabbing a police officer. Khan also saw defendant grab Officer Acot's gun and not release his grip even when down on the ground.

¶ 26    On cross-examination, Khan testified that he knew Officers Gutierrez, Acot, and Drews. He had worked with them on other incidents and continued to work with them. Khan wrote a statement for police shortly after the incident. He admitted that, in his report, he never mentioned defendant grabbing Officer Acot's gun or Officer Acot yelling that defendant had grabbed his gun.

¶ 27    Officer Drews, who had worked as a police officer for seven years, testified as follows. Officer Drews remained on the sidewalk and spoke with security personnel while Officers Acot and Gutierrez were trying to make contact with defendant. Defendant was very uncooperative and was exchanging words with Officer Gutierrez. Defendant reached his arm out through his screen door, but Officer Drews did not see defendant make physical contact with Officer Gutierrez. At this point, Officer Drews was on the top step. Officer Drews came down the stairs to assist when he heard Officer Gutierrez tell defendant that he was under arrest. Officer Acot yelled that defendant was trying to grab his gun. At this point, defendant was halfway out but his feet were caught up on the screen door. Officer Drews did not see defendant grab Officer Acot's gun, "with everything going on"; he concentrated on grabbing defendant's feet. Once defendant was on the ground, Officer Acot again said that defendant was trying to get his gun. Five or six times, the officers tried to put defendant's hands behind his back, and they told defendant he would be tased. Defendant refused to comply, so Officer Drews administered a dry stun to his back.

¶ 28    On cross-examination, Officer Drews testified that he did not see defendant grab Officer Gutierrez, because it was dark and because he was at the top of the stairs talking to "Bill," one of the security guards. Officer Drews did not recall where Khan was standing during the incident. Defendant was tased because he repeatedly refused to put his hands behind his back. Officer Drews completed a report after the incident. In describing the nature of the incident, Officer Drews checked the "Resistance" box as opposed to the "Assaultive" box.

¶ 29    At the close of the State's evidence, defense counsel made a motion for a directed verdict, which the trial court denied. The case was continued to the next day, and defense counsel told the court that he had "potentially two witnesses."

¶ 30    Defendant testified as follows. Defendant, age 26, and Amanda had two children together. On the night of the incident, defendant drank 1½ cups of tequila, and he and Amanda had a "little argument." Defendant did not strike Amanda that night and had never struck her. Defendant and Amanda were watching television in the bedroom when they heard a knock on the door around 11 p.m. Defendant was annoyed and hoped the person would go away. Finally, he went to the door and saw that it was the police. Defendant was not happy to see the police, due to an earlier "incident."

¶ 31    The police said that they were there for a disturbance, and defendant replied that there was no disturbance in the apartment. Several times, the police asked to come inside the

apartment, but defendant refused because there was no need. The police asked to see Amanda, and defendant called her out of the bedroom. She came and stood beside defendant. The police asked if she was okay, and Amanda said that she was fine. The police continued to ask about coming inside and shined a flashlight on Amanda. She had no bruises, scratches, broken bones, or other injuries, because defendant never struck Amanda that night.

¶ 32 Defendant admitted having an exchange with one of the officers and cussing at him. The officer told defendant that, if he were not on duty, he would come inside defendant's apartment and "kick" defendant's "butt." Defendant replied that the officer could take off his gun and badge and vest and come inside, but the officer said " 'I can't do that.' " Though the officers had shined the light on Amanda and asked if she was fine, they continued to stand there and "taunt" defendant. Defendant admitted that he was not polite in telling them to leave.

¶ 33 Defendant walked toward the screen door to lock it. As he locked it, Officer Gutierrez grabbed his wrist and pulled him halfway through the screen door. Defendant denied having his whole torso outside of the screen window before the police pulled him through the door. Defendant pulled back because he did not know why they were grabbing him. Then, Officer Acot grabbed defendant and said that defendant was trying to grab his gun. Defendant denied knowingly grabbing Officer Acot's gun. Defendant thought that, when the officers pulled defendant and he pulled back, he "might have touched [the] gun belt or grabbed [the] gun belt." Defendant said that he had no balance and that he did not recall grabbing Officer Acot's gun. Officer Drews assisted, and all three officers pulled him completely through the screen door to the ground. Defendant was then tased.

¶ 34 On cross-examination, defendant testified that the apartment belonged to his sister. Defendant admitted that he wanted to fight Officer Gutierrez based on what Officer Gutierrez said to him. Officer Gutierrez never told defendant that he was under arrest for grabbing him, and defendant never grabbed anyone. Defendant said that, with three officers grabbing and pulling him, it was possible that he touched Officer Acot's duty belt. Defendant was not told that he was under arrest until he was cuffed and taken to the squad car.

¶ 35 On redirect, defendant testified that he had been living in his sister's apartment for three or four months. It was his residence at the time; he had mail delivered there. Defendant never intended to grab the officer's gun; he was suspended over the screen door and trying to regain his balance.

¶ 36 When the court advised defense counsel to call his next witness, defense counsel asked for a brief recess. The court asked the purpose of the recess. In a sidebar conference, defense counsel responded, "I'm not sure, could I have a second to talk to [defendant]?" The court granted the recess, which was followed by a jury instruction conference. After the jury instruction conference, the court asked defense counsel if he had any more witnesses, and defense counsel rested.

¶ 37 As a rebuttal witness, the State called Officer Acot, who testified as follows. Neither he nor Officer Gutierrez threatened defendant during the incident. Defendant reached through the broken screen door and grabbed Officer Gutierrez; no officer touched defendant. Once defendant grabbed Officer Gutierrez, he was told that he was under arrest. Defendant did not

merely brush or bump his gun; he grabbed it.

¶ 38    On cross-examination, Officer Acot testified that, within a second or two of defendant putting his hand on his gun, he clamped down his hand on defendant's hand.

¶ 39    On redirect, Officer Acot testified that defendant did not release his hand from the gun because Officer Acot clamped down with his arm. Defendant released the gun after he was tased.

¶ 40    The second and final rebuttal witness, Officer Gutierrez, testified as follows. He never threatened defendant and never heard any other officer do so. Defendant reached through the screen and grabbed him. Prior to that, none of the officers had touched defendant. After defendant grabbed him, Officer Gutierrez told defendant that he was not allowed to grab him and that he was under arrest. When defendant touched him, he felt surprised, shocked, and insulted.

¶ 41    On cross-examination, Officer Gutierrez testified that he asked multiple times to come inside defendant's apartment. He denied being frustrated; the police dealt with drunk people all the time. Officer Gutierrez agreed that, as part of his policing duties, he had to deal with people who were drunk, salty, and violent; he was trained to deal with those people.

¶ 42    The State rested, and defense counsel stated that he had a surrebuttal witness. The court called a sidebar conference and the following exchange occurred:

> "THE COURT: I don't think so.
>
> MR. CAMPBELL [Defense counsel]: No–what?
>
> THE COURT: No Surrebuttal. We end after Rebuttal.
>
> MR. CAMPBELL: I get a chance to rebut what they said.
>
> THE COURT: No, you don't.
>
> MR. CAMPBELL: Can we have all of this on the record, please."

¶ 43    The parties delivered their closing arguments, and the jury retired to deliberate. At this time, the court addressed defense counsel's attempt to call a witness on surrebuttal. Defense counsel advised the court that he had planned to call Amanda as a surrebuttal witness. The court advised defense counsel that "most likely" she should have been called as a defense witness, because the State had the last word, and the only issues on rebuttal were the touching or the grabbing of the gun and who grabbed whom first.

¶ 44    At this point, the jury submitted a letter to the court, asking the "Legal definition of insulting nature." With the parties' agreement, the court responded to the jury that "[t]he word 'insulting' is a commonly used word that is neither vague nor difficult for the average person to define. We hold that this definition is adequately specific." The jury found defendant guilty of aggravated battery and not guilty of disarming a peace officer.

¶ 45    Defendant filed a motion in arrest of judgment and a motion for a new trial. The overlapping claim in both motions was that the trial court erred by permitting the State to amend the indictment on the day of trial, because the amendment did not cure a formal defect. Defendant admitted that the grand jury transcript referred to an improper grabbing or aggravated battery of Officer Gutierrez. Nevertheless, defendant argued, grabbing Officer Acot's gun also constituted an aggravated battery, and Officer Acot was the only victim

specified by the grand jury.

¶ 46    Defendant also argued in his motion for a new trial that the court erred by failing to allow him to present Amanda as a surrebuttal witness. Defendant contended that new evidence was presented during the rebuttal testimony of Officers Gutierrez and Acot. First, Officer Acot offered different testimony regarding defendant's actions in grabbing his gun. Second, Officer Gutierrez said that he felt "insulted" by the contact from defendant, which was the first time he had testified to an element of the offense. Defendant argued that he could not have presented Amanda's testimony during his case-in-chief, because her testimony as to the "insulting" nature of defendant's actions would have been irrelevant and "perhaps drawn undue attention to an as-yet unsubstantiated element of the offense."

¶ 47    The court denied defendant's motions. Regarding the amendment, the court found that defendant had adequate discovery and was on notice of the issues; both Officers Gutierrez and Acot were involved in the incident; and defendant did not take up the court's offer of a continuance.

¶ 48    Following a sentencing hearing, defendant was sentenced to 4½ years' imprisonment. Defendant timely appealed.

¶ 49                                II. ANALYSIS

¶ 50                          A. Amendment of Indictment

¶ 51    Defendant first argues that the State's amendment to the indictment was substantive and not simply the correction of a formal defect. By changing the name of the victim from Officer Acot to Officer Gutierrez, defendant concludes, the State broadened the charge against him to include conduct not previously charged.

¶ 52    Where a prosecution is brought by indictment, the grand jury has found the existence of probable cause, and no preliminary hearing is held. *People v. White*, 221 Ill. 2d 1, 9 (2006). Once the grand jury has returned an indictment, it may not be broadened through amendment except by the grand jury itself. *Id.* at 9-10. The reason for this rule is to ensure that individuals' rights are not at the mercy or control of a prosecutor. *People v. Ross*, 395 Ill. App. 3d 660, 667 (2009); see also *People v. Glass*, 232 Ill. App. 3d 136, 147 (1992) (an indictment may not be broadened by amendment except by the grand jury, in order to protect individuals from being prosecuted for a different offense than the one charged).

¶ 53    However, an exception to this rule provides that an indictment may be amended on motion of the prosecutor or the defendant for the purpose of correcting formal defects if no surprise or prejudice to the defendant results. *White*, 221 Ill. 2d at 10. Section 111-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111-5 (West 2008)) provides a list of formal defects, such as "[a]ny miswriting, misspelling or grammatical error," though the list is not exclusive (*People v. Milton*, 309 Ill. App. 3d 863, 866 (1999)).

¶ 54    Formal defects are distinguished from substantive changes that alter the nature and elements of the offense charged. *Ross*, 395 Ill. App. 3d at 668. The First District has held that an amendment is substantive and therefore improper if (1) it materially alters the charge, and (2) it cannot be determined whether the grand jury intended the alteration. *Id.* When

reviewing the trial court's decision to allow or deny an amendment to the indictment, we apply an abuse-of-discretion standard. *People v. Edmonds*, 325 Ill. App. 3d 439, 444 (2001).

¶ 55    In this case, defendant argues that both factors stated above exist here. First, he maintains that the amendment materially altered the charge because the identity of the victim is an essential element of an aggravated battery. Second, he argues that it cannot be determined whether the grand jury intended to indict defendant for aggravated battery against Officer Gutierrez or Officer Acot.

¶ 56    Regarding defendant's first argument, we find *People v. Jones*, 53 Ill. 2d 460 (1973), and *Ross* instructive. In *Jones*, the sole issue on appeal was whether the misidentification of the armed-robbery victim constituted a formal defect under section 111-5 of the Code. *Id.* at 462. The indictment named Charles Mundy as the victim instead of his father, Delbert Mundy, and the State moved to amend the indictment on the morning of trial. *Id.* Defense counsel objected to the amendment, but the trial court allowed it. *Id.* On appeal, the State argued that the armed-robbery victim's name was not an essential element of the offense, thereby rendering the error a formal defect. *Id.* at 462-63. Significantly, the supreme court rejected this argument and held that the identity of the armed-robbery victim was an essential element of the offense. *Id.* at 463. Nevertheless, the supreme court did not find that conclusion dispositive of whether the misstatement of identity was a formal or substantial defect. *Id.* at 463-64. In fact, the court found the name change of the victim to be a mere formality. *Id.* at 464. The court reasoned:

> "The liberalization of criminal pleading also reflects a lessening in importance of the indictment's secondary functions. The indictment as a means of informing defendants of particulars concerning the case is now far overshadowed by the array of discovery procedures available to the defense. Similarly, the time when an indictment defined the limits of jeopardy has passed and a prior prosecution on the same facts may be proved by resort to the record. [Citation.] The primary safeguard of indictment by grand jury which remains secured to criminal defendants, is to protect individuals from the caprice of the public prosecutor. ***
>
> We believe that this constitutionally required protection has been afforded this defendant and that the particular facts in this case demonstrate the amendment of the victim's first name to be a mere formality. Where, as here, no hint of surprise or prejudice to the defendant is shown, allowance of such an amendment is not error." *Id.* at 464-65.

¶ 57    A much more recent case, *Ross*, decided in 2009, also considered whether the State's amendment to an indictment was formal or substantive. In *Ross*, the indictment alleged criminal sexual assault, and the proposed amendment changed the name of the victim from G.W. to C.C. and changed the type of sexual contact. *Ross*, 395 Ill. App. 3d at 663. Citing *Jones*, the court noted that it was permissible to revise the indictment when the victim of a crime has been misidentified, and it found the amendment to be formal. *Id.* at 668, 673. These cases show that an amendment correcting the misidentification of a victim, even when it is an essential element of the offense, can be formal.

¶ 58    Defendant's second argument is that it is impossible to know whether the grand jury

intended to indict defendant for an aggravated battery against Officer Gutierrez. According to defendant, the grand jury heard testimony that defendant touched both Officers Gutierrez and Acot, and defendant's touching of Officer Acot's belt and gun constituted aggravated battery. In addition, defendant points out that the grand jury heard testimony that, once he was on the ground, he continued to fight with the officers, meaning that he could have made insulting or provoking contact with Officer Acot at this time.

¶ 59 Regarding what transpired before the grand jury, the State is correct that the testimony consisted of only a very brief summary given by Detective Brandt. Though the grand jury was asked to charge defendant with three counts (disarming a peace officer, aggravated battery, and resisting a peace officer), the names of the victims appearing on the indictment were not specified verbally during the proceeding. Then, the State waited two years, until the day of trial, to move to amend the indictment by changing the officer's name on the aggravated battery charge. While we determine that the grand jury transcript supported the State's amendment, as we discuss below, we caution the State that its actions in this case rivaled the "sloppy" amendment that occurred in *Ross*. See *id.* at 663 (where the trial court chastised the State for not catching its mistakes sooner and characterized its actions as "sloppy").

¶ 60 As far as discerning the intentions of the grand jury, defendant argues that *Jones* and *Ross* are distinguishable on this very basis. First, he argues that the amendment in *Jones* was formal "not because it did not materially alter the charge, but because it could be determined that the change reflected the intention of the grand jury." Defendant points out that, unlike in this case, where the grand jury transcript supported a charge of aggravated battery of either Officer Acot or Officer Gutierrez, there was no evidence in *Jones* suggesting that the offense had been committed against the victim's son. Second, he argues that the court in *Ross* noted that the grand jury transcript supported the State's argument in terms of altering the victim's name and that defense counsel did not dispute that the amendment conformed with the intentions of the grand jury. See *id.*

¶ 61 We agree with defendant that the case at bar is not on all fours with *Jones* and *Ross* in that neither of those cases involved multiple victims. Yet, this does not change the fact that the grand jury transcript in this case envisioned an aggravated battery charge with Officer Gutierrez as the victim. As in *Ross*, defense counsel here agreed that the grand jury transcript referred to an aggravated battery of Officer Gutierrez. Indeed, the grand jury transcript indicated that defendant reached out and grabbed hold of Officer Gutierrez's arm and that Officer Gutierrez told defendant not to grab him and that he was under arrest. Though defendant is correct that grabbing Officer Acot's gun and belt or resisting arrest could also constitute an aggravated battery, the most direct evidence specific to a charge of aggravated battery pertained to Officer Gutierrez. Because the grand jury transcript clearly supports the inference that the grand jury intended to charge defendant with aggravated battery for grabbing the arm of Officer Gutierrez, we reject defendant's argument to the contrary.

¶ 62 Defendant's final attack on the amendment is that "prejudice is not relevant to this inquiry," because requiring a prejudice showing for substantive changes would eliminate the distinction between substantive and formal amendments. This argument is easily dispensed with, as it is not supported by the case law. See *People v. Martin*, 266 Ill. App. 3d 369, 373

(1994) (a defendant's lack of surprise by the amendment strengthens the finding that the amendment is merely technical; where the defendant is neither surprised nor prejudiced, the trial court commits no error in allowing the State to amend the charging instrument); see also *People v. House*, 202 Ill. App. 3d 893, 905 (1990) (same).

¶ 63 In fact, this court's recent decision in *People v. Shipp*, 2011 IL App (2d) 100197, shows that the surprise/prejudice component is directly intertwined with the formal/substantive distinction. In *Shipp*, this court stated that "[c]ourts have typically found amendments to be material only where a defendant was surprised by an amendment." *Id.* ¶ 23. Examples of cases in which the defendant was surprised included *People v. Patterson*, 267 Ill. App. 3d 933, 939 (1994), where the amendment was material because the change in the quantity of the controlled substance possessed by the defendant affected both the crime and the punishment, and *People v. Betts*, 78 Ill. App. 3d 200, 203-04 (1979), where the amendment changed the very offense with which the defendant was charged and also the range of penalty. *Shipp*, 2011 IL App (2d) 100197, ¶¶ 23-24.

¶ 64 On the other hand, this court noted in *Shipp* that "courts that have found amendments to be formal normally found that the change did not surprise the defendant." *Id.* ¶ 25. This is the situation here. As previously stated, defendant acknowledged to the trial court that the aggravated battery of Officer Gutierrez was referenced in the grand jury transcript. Presumably because of this awareness, defendant declined the opportunity for a continuance, which the trial court offered to ensure that there was no impact on the defense strategy. See *People v. Alston*, 302 Ill. App. 3d 207, 211 (1999) (the "[d]efendant's nonspecific allegations of prejudice are belied by the fact that he did not seek a continuance of the trial to prepare his defense"). Therefore, the fact that defendant did not claim surprise or seek a continuance is not irrelevant, as he asserts, but rather it strengthens the finding that the amendment was merely technical.

¶ 65 Given that *Jones* and *Ross* allow for an indictment to be amended based on the misidentification of the victim, that the grand jury transcript supported an aggravated battery charge against defendant for grabbing Officer Gutierrez, and that defendant was not surprised or prejudiced by changing the officer's name, we agree with the trial court that the amendment was formal. Accordingly, the trial court did not abuse its discretion in allowing it.

¶ 66                                    B. Ineffective Assistance of Counsel

¶ 67 Defendant's remaining two arguments are that defense counsel was ineffective. First, he argues that his counsel was ineffective for failing to strike a juror who was biased. Second, he argues that his counsel was ineffective for waiting until surrebuttal to call Amanda as a witness.

¶ 68 The two-prong test for assessing whether trial counsel was ineffective is articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a defendant must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness; second, he must show that the deficient performance prejudiced him in that, but for counsel's deficient performance, there is a reasonable probability that the result would have been

different. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). "In demonstrating, under the first *Strickland* prong, that his counsel's performance was deficient, a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct must be considered sound trial strategy." *Id.* Under the second prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome. *Id.*

¶ 69                                                  1. Jury Selection

¶ 70        With respect to selecting the jury, defendant argues that defense counsel was ineffective for failing to seek the removal of Glees. Defendant argues that this case boiled down to a credibility contest between the testimony of defendant and the testimony of Officers Gutierrez and Acot regarding whether he grabbed Officer Gutierrez's arm. On the one hand, Officers Gutierrez and Acot testified that defendant initiated the physical confrontation by grabbing Officer Gutierrez's arm. On the other hand, defendant disputed this version of events and testified that Officer Gutierrez initiated contact by grabbing his wrist and pulling him halfway through the screen door. Defendant points out that defense counsel failed to use a for-cause challenge or a peremptory challenge for Glees, even though he "repeatedly acknowledged he would give more credibility to a police officer's testimony than that of a lay person." Compounding matters, Glees became the jury foreperson. According to defendant, no reasonable defense attorney would have allowed Glees to serve as a juror, because he was biased against defendant in the most crucial aspect of the trial. This is especially true, defendant argues, given that, when he questioned Glees, defense counsel had not used any of his peremptory challenges and used only one such challenge during the entirety of *voir dire*.

¶ 71        A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined prior to the proceeding. *People v. Manning*, 241 Ill. 2d 319, 330 (2011). "*Voir dire* is conducted to assure the selection of an impartial jury, free from bias or prejudice, and grant counsel an intelligent basis on which to exercise peremptory challenges." *People v. Dixon*, 382 Ill. App. 3d 233, 243 (2008). In general, counsel's actions during jury selection are considered a matter of trial strategy, and counsel's strategic choices are virtually unchallengeable. *Manning*, 241 Ill. 2d at 333. Attorneys consider many factors in making their decisions about which jurors to challenge and which jurors to accept, and reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable. *Id.* at 335.

¶ 72        We briefly summarize what transpired in the context of defense counsel's questioning of Glees. Another potential juror, Williams, had just stated that her uncle had been a police officer and that she would give more credibility to a police officer's testimony than defendant's testimony. Defense counsel then questioned Glees:

> "Q. And again, I understand all of us are favor–or very favorable, may have very favorable experiences with police officers, I'm not saying anything bad about a police officer but would you give a police officer any more credibility, his testimony, right off Jump Street?

-14-

A. I think I would, just because being taught that they're to uphold the law and they're to be honest and credible witnesses.

Q. Now anything an officer said, would you just assume that that is true?

A. I would not say that I might assume it, I would like to think that I would listen to all of the facts and make a decision bassed [*sic*] on that.

Q. You said that you would like to think?

A. Well, I would have to go through the trial and see what happens. I'm just saying that police officers are–they're to uphold the law and [*sic*] gives them credence.

Q. Just like all of us here?

A. Yes.

Q. So you are more likely to give credibility after the fact, would you say that you would be more likely to give a police officer's testimony than any other citizen?

A. I am saying I would believe they would be more credible.

Q. Okay."

At a sidebar conference, defense counsel indicated that he was "going to show cause." The court stated that it would ask some follow-up questions, and it posed them to Williams. After confirming that Williams could not be fair and impartial in this case, the court excused Williams for cause. Defense counsel then began questioning the replacement juror, and the replacement juror and Glees were accepted as jurors in the next panel. Based on this record, defendant argues that defense counsel's failure to remove Glees was not "strategy" but forgetfulness due to his questioning of a replacement juror after Williams was removed for cause. We disagree for several reasons.

¶ 73    First, we note that defendant's argument focuses primarily on Glees's last response, which he argues shows that Glees "definitely" would find police officers more credible. However, by isolating Glees's final answer, defendant inflates its significance and takes it out of context. Contrary to defendant's approach, the entire *voir dire* must be considered, meaning that it is improper to focus on one answer or a "few answers" that skew the analysis of whether defense counsel was deficient. See *Manning*, 241 Ill. 2d at 334. The *voir dire* of Glees in its entirety reveals that he said that he would *not* assume that anything a police officer said was true; he would like to think he would listen to all of the facts of the case and make a decision based on that; and he would have to go through the trial and see what happened. Overall, Glees stated that while he "would believe" that police officers would be more credible based on their duty to uphold the law, he would not assume that they were truthful and would have to see what transpired at trial. Because the totality of Glees's responses showed that he could be fair and impartial, it was a matter of trial strategy for defense counsel to accept him as a juror.

¶ 74    Second, other cases have found defense counsel's failure to remove a juror to be a matter of trial strategy even when the juror made considerably stronger statements about their potential inability to be impartial than Glees made here. For example, in *Manning*, the juror A.C. gave conflicting answers regarding his impartiality by first saying that sex offenders should be locked up for life; by then saying that he could listen to a case and render a

-15-

judgment on a case that was separate and distinct from a sex offender case; and then by concluding that he could not be fair in the case. *Manning*, 241 Ill. 2d at 322-23, 336. The court determined that, in considering the entire *voir dire* of A.C. in context, it was possible that defense counsel decided that A.C. was not unequivocally biased. *Id.* at 335.

¶ 75    Prior to *Manning*, the supreme court decided *People v. Metcalfe*, 202 Ill. 2d 544 (2002), where the State questioned juror Grevus about a crime to which she was a witness. *Id.* at 549. Grevus explained that, though she had positively identified the perpetrator, he " 'got off because of a technicality.' " *Id.* Defense counsel then asked if the result of that case would bias her in the instant case, and she said that she " 'would have to answer yes.' " *Id.* at 550. Grevus expounded, stating that she felt like the criminal in the prior case, because she was discredited as a witness even though the perpetrator was clearly guilty. *Id.* Defense counsel asked if that experience would affect her ability to be fair, and she again replied " 'Yes. You ever had something like that to happen to you, it's hard not to feel that way.' " *Id.* Despite her responses that she could not be impartial, the supreme court concluded that defense counsel's decision not to seek her removal was a matter of trial strategy. *Id.* at 562. The court reasoned that it was possible that defense counsel considered that Grevus's bias toward the system might be directed against the State rather than the defendant. *Id.*

¶ 76    Later, in *People v. Begay*, 377 Ill. App. 3d 417 (2007), the defendant argued that defense counsel was ineffective for failing to remove juror Mendoza, who stated during *voir dire* that she could not be fair and impartial. *Id.* at 422. Mendoza's mother had been assaulted at knife point during a robbery five years before. *Id.* Mendoza was not a witness to the incident but went to court regarding the case. *Id.* at 422-23. When asked if that experience affected her ability to be fair and impartial in the instant case, she replied, " 'Yes.' " *Id.* at 423. When asked if she " 'wouldn't be fair, either,' " she said, " 'No.' " *Id.* In determining that defense counsel's decision not to challenge Mendoza was a matter of trial strategy, the court reasoned that defense counsel may have believed that Mendoza would sympathize with the defendant, a woman who like her mother claimed to have been fighting back against an attacker who had assaulted her at knife point. *Id.*

¶ 77    Defendant distinguishes *Metcalfe* and *Begay* on the basis that there were strategic reasons for not removing those jurors, as compared to Glees, whose pro-police bias would only hurt the defense. However, defendant cannot distinguish *Manning*. Whereas Williams, because her uncle was a police officer, unequivocally stated that she could not be fair, defense counsel could have determined that Glees's answers overall showed that he would take the trial seriously and truly consider the evidence before reaching a decision. Rather than giving "rote" or "safe" answers, defense counsel could have found, Glees was particularly forthright, humble, and honest and was not unequivocally biased.

¶ 78    Finally, defendant's reliance on *People v. Defyn*, 222 Ill. App. 3d 504 (1991), and *People v. Ford*, 113 Ill. App. 3d 659 (1983), is unpersuasive. Neither of those cases involved jury selection. Rather, they focused on the prosecutor's statements during closing argument that improperly bolstered the credibility of the police officers who had testified. See *Defyn*, 222 Ill. App. 3d at 513-14; *Ford*, 113 Ill. App. 3d at 662.

¶ 79    In sum, the cases illustrate that defendant bears a heavy burden to overcome the

presumption that counsel's decisions during jury selection, even if questionable, were a matter of trial strategy. We find that defense counsel was not deficient in this respect.

¶ 80                                    2. Failure to Call Amanda

¶ 81    Defendant's next argument is that defense counsel was ineffective for waiting until surrebuttal to call Amanda as a witness. According to defendant, Amanda's testimony would have corroborated defendant's version of events; she was present and ready to testify at trial; and during opening argument defense counsel told the jury that she would testify. Because a reasonable attorney would have known that Amanda might not be able to testify on surrebuttal, defendant argues that, rather than being a sound strategy, it was a "procedural mistake."

¶ 82    "Matters such as whether to put a witness on the stand at trial are generally matters of trial strategy." *People v. Eggleston*, 363 Ill. App. 3d 220, 226 (2006). "[A] reviewing court must indulge in a strong presumption that counsel's conduct fell into a wide range of reasonable representation, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009). A defendant can overcome the strong presumption that defense counsel's choice of strategy was sound if his or her decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy. *Id.* For instance, defense counsel can be deemed ineffective for failure to present exculpatory evidence of which he or she is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *Id.*

¶ 83    Still, defense counsel's failure to present testimony promised during opening argument is not ineffective assistance of counsel *per se*. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Defense counsel's decision to abandon a trial strategy during trial might be reasonable under the circumstances and the decision not to present promised testimony might be warranted by unexpected events. *Id.*; see also *Bryant*, 391 Ill. App. 3d at 239 (abandoning or changing a defense during trial can be a plausible strategic decision). Moreover, neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates that defense counsel was incompetent. *People v. Jones*, 323 Ill. App. 3d 451, 457 (2001).

¶ 84    In analyzing defendant's argument, we review the sequence of events at trial. During opening argument, defense counsel stated that, even after hearing that Amanda was fine and shining the light on her, the officers still wanted to go inside defendant's apartment. Defense counsel argued that they dragged defendant through the top of his screen door and that any violence stemmed from them. Twice, defense counsel said that the jury would hear from Amanda, and he said that they would hear from the officers and "probably" defendant. During the State's case-in-chief, Officer Gutierrez testified that when defendant grabbed his arm he was "startled, stunned," but he never used the word "insulted." After the State rested, defendant testified and the court advised defense counsel to call his next witness. At this point, defense counsel requested a recess to talk to defendant, which the court granted. After

this recess, defense counsel rested. The State then called Officer Gutierrez (and Officer Acot) in rebuttal. During Officer Gutierrez's rebuttal testimony, he said that when defendant touched him he felt surprised, shocked, and "insulted." After this testimony, defense counsel tried to call Amanda as a surrebuttal witness. The court denied defense counsel's request, however, stating that Amanda should have been called as a defense witness.

¶ 85 Fortunately, we have the benefit of defense counsel's motion for a new trial to illustrate his trial strategy. In his motion, defense counsel argued that the court erred by failing to allow him to present Amanda as a surrebuttal witness, because both officers presented new evidence during rebuttal. With respect to Officer Gutierrez in particular, defense counsel pointed out that he testified that he felt "insulted" by the contact from defendant, which was the first time he had testified to an element of the offense. According to defense counsel, he could not have presented Amanda as a defense witness, because her testimony as to the "insulting" nature of defendant's actions would have been "irrelevant" and "perhaps drawn undue attention to an as-yet unsubstantiated element of the offense."

¶ 86 Based on this record, defense counsel's decision not to call Amanda as a defense witness amounted to a sound strategy and not a procedural mistake. Clearly, defense counsel initially planned to call her, as evidenced by his statements during opening argument. However, defense counsel changed his mind after Officer Gutierrez stated only that he was "startled, stunned" by defendant's contact with him. Perceiving the State's case as weak or lacking in proof on the issue of contact of an "insulting nature," defense counsel chose to forgo calling Amanda and thus possibly alerting the State to its weakness. As the State argues, while "insulting" contact can be proven by inference rather than by a witness's specific use of the term, the defense case would have been stronger if defense counsel could have argued that Officer Gutierrez never actually said that he was "insulted." Rather than have Amanda provide a narrative that probably would have duplicated defendant's version of events, defense counsel chose to exploit a weakness in the State's case on this crucial element of the offense of aggravated battery. Consequently, defense counsel conferred with defendant when it was time to call Amanda as a defense witness, and defendant apparently agreed that it was best not to call her. See *Wilborn*, 2011 IL App (1st) 092802, ¶ 82 (defense counsel's decision not to call a witness whom during opening argument he promised would testify appeared to be the product of sound trial strategy, a strategy the defendant agreed with).

¶ 87 The cases relied on by defendant to compel an opposite result are unpersuasive. In *Bryant*, defense counsel promised the jury that it would hear evidence supporting the defense. *Bryant*, 391 Ill. App. 3d at 239-40. However, defense counsel failed to call any witnesses and unsuccessfully attempted to elicit evidence in support of his theory through the cross-examination of State witnesses. *Id.* at 240-41. In finding defense counsel deficient, the court stated that it appeared that defense counsel concluded that, rather than support the defense theory with evidence that the jury might reject, it was better to not support the theory at all. *Id.* at 241. Here, unlike in *Bryant*, defense counsel did not fail to present a defense; he merely changed strategies with respect to calling Amanda, after perceiving a weakness in the State's case. In *People v. York*, 312 Ill. App. 3d 434 (2000), defense counsel was found ineffective for failing to present DNA testing that showed that there was no semen from the defendant on the victim, which supported his theory that the defendant did not participate in

the assault. *Id.* at 437-38. Again, defense counsel made no such error in this case, where his decision not to call Amanda was a matter of trial strategy.

¶ 88                            3. Prejudice and Cumulative Error

¶ 89     Defendant's final argument is that the cumulative effect of defense counsel's errors resulted in prejudice. However, even if we were to assume, *arguendo*, that defense counsel was deficient in one or both of the ways alleged by defendant, he cannot establish prejudice. Overall, the record shows that defense counsel argued plausible theories to counter both charges against defendant; he succeeded in obtaining a not-guilty verdict on the charge of disarming a peace officer (a Class 2 felony, like the aggravated battery charge); he thoroughly cross-examined the State's witnesses; and he successfully raised a question in the jury's mind as to whether defendant's contact with Officer Gutierrez was of an insulting nature, as evidenced by the jury's question to the court. Therefore, defendant cannot establish prejudice under *Strickland* or under a cumulative-error theory. See *People v. Perry*, 224 Ill. 2d 312, 356 (2007) (in rejecting every claim of error by the defendant that defense counsel was ineffective, cumulative-error analysis was not necessary).

¶ 90                                III. CONCLUSION

¶ 91     For the aforementioned reasons, the judgment of the Kane County circuit court is affirmed.

¶ 92     Affirmed.