2023 IL App (2d) 220249-U
No. 2-22-0249
Order filed June 1, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-40 |
| ROBERT D. GAILLARD, | ) ) | Honorable Marcy L. Buick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Trial counsel was not ineffective for failing to move to strike a juror.  However, the trial court failed to conduct a preliminary inquiry into defendant's *pro se* ineffective-assistance claims.  Remanded.

¶ 2   After a jury trial, defendant, Robert D. Gaillard, was convicted of three counts of home invasion (720 5/19-6(a)(2), (3), (6) (West 2020)), armed robbery (720 ILCS 5/18-2(a)(2) (West 2020)), two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(8) (West 2020)), and resisting a peace officer (720 ILCS 5/31-1(a) (West 2020)).  The court sentenced him to two consecutive terms of 30 years' imprisonment for aggravated criminal sexual assault, two

concurrent terms of 25 years' imprisonment (to run consecutive to the 30-year terms) for home invasion and armed robbery, and 1 year in the county jail for resisting a peace officer (time already served). Defendant appeals, arguing that trial counsel was ineffective for failing to strike a juror, and that the trial court failed to conduct a preliminary inquiry into his *pro se* claims of ineffective assistance of counsel, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984) ("*Krankel* inquiry"). For the following reasons, we agree with defendant's second argument and remand.

¶ 3                              I. BACKGROUND

¶ 4     According to the charges, on January 19, 2021, defendant, without authority and knowing they were present, entered an apartment occupied by David Choice and Rashida Larence. He pointed a firearm at David and ordered him into his room, where he struck David in the head with the firearm. Further, he pointed the firearm at Larence and ordered her into her room, where he placed his penis in her mouth and on her vagina. Finally, defendant, still armed with the firearm, knowingly took David's PlayStation 5 video game system and ran away from a police officer. Also present in the apartment were Rameal Choice, David's brother, and two children. In addition, defendant's co-defendant, Awann Wood, was armed with a butcher knife.

¶ 5                           A. Pretrial Proceedings

¶ 6     On March 14, 2022, immediately before jury selection commenced, the trial court asked defendant if there was anything else he would like his counsel to do before trial or if there was anything he would like to discuss with counsel. Defendant replied, "no."

¶ 7     During jury selection, defendant's counsel used four of his seven peremptory challenges while questioning the first panel of the venire. While questioning the second panel, counsel used a fifth peremptory challenge on juror number two. Then, juror number six, who runs a Suburban Apartments housing complex in DeKalb and, in that context, sometimes works with police

officers, expressed a concern regarding his own impartiality. Specifically, although juror six stated that he understood and accepted all four of the principles required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012),[1] and could be fair, the following exchange occurred between the juror and defense counsel, Brian Erwin:

"MR. ERWIN: Is there any reason that you feel that you couldn't be fair and impartial sitting on today's case?

PROSPECTIVE JUROR: I believe that with my religious beliefs might affect a bit in the case.

MR. ERWIN: I don't want to get too much into it, and obviously everyone has the right to their religion. What is it about your religious beliefs that you believe would affect your ability to sit as a juror?

PROSPECTIVE JUROR: If it was discussed that three or more people come forward and that mind that it is the person, our religion belief that that is the person testifying-wise.

MR. ERWIN: So if three or more people come in and say that someone is the individual, then in your religion you believe that that's—that you have to accept that?

---

[1]The four principles are: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." *Id.*; see also *People v. Zehr*, 103 Ill. 2d 472 (1984).

PROSPECTIVE JUROR: Yes.

MR. ERWIN:  So if it's less than three people, then you don't accept it?

PROSPECTIVE JUROR: Right.

MR. ERWIN:  So with that being the case do you think that you can be fair and impartial, then, knowing that there's your religion permits or doesn't permit you to make a decision?

PROSPECTIVE JUROR:  I will be fair.

MR. ERWIN:  Okay.  And I'm not trying to press too much on this, but if less than three people say someone did it, your religion allows you to make your own decision as to whether you believe those individuals?

PROSPECTIVE JUROR:  That depends on the evidence.

MR. ERWIN:  But regardless of the evidence, if three people come in and say that they did it, then your religion—I don't want to say forces you, but yourself religion is based on then that is correct?

PROSPECTIVE JUROR:  That is correct.

MR. ERWIN:  And that's what you have to accept?

PROSPECTIVE JUROR:  Yes.

MR. ERWIN:  Regardless of whatever evidence may show?

PROSPECTIVE JUROR:  Correct.

MR. ERWIN:  Okay. So with that being the case, if three or more people come in and say something even though the evidence may say otherwise, you have to accept the fact that those three or more people said something and you have to accept that based on your religion?

PROSPECTIVE JUROR:  Yes.

MR. ERWIN:  Okay. And again, I'm going to ask then specifically do you think then you can be fair and impartial knowing that you have to accept what your religion teaches you?  And I'm not going against that, but do you think that you can be fair and impartial then knowing that you're not really going to listen to any of the evidence if simply because three or more people say something?

PROSPECTIVE JUROR:  Yeah. I'll be fair.

MR. ERWIN:  Okay. Can I have one moment?

THE COURT:  Yes.

\*\*\*

MR. ERWIN:  Juror No. 6, let me ask you this.

PROSPECTIVE JUROR:  Yes.

MR. ERWIN:  The State has to prove beyond a reasonable doubt.  If they're unable to prove beyond a reasonable doubt, do you have a problem signing a not guilty verdict?

PROSPECTIVE JUROR:  No, I don't have a problem.

MR. ERWIN:  Thank you.  Judge, we will now accept and tender."

¶ 8     The State also accepted juror six, and he was impaneled.

¶ 9                                B.  Trial

¶ 10    The State produced 13 witnesses at trial, 3 of whom testified to events that occurred within the apartment, with the remaining 10 testifying to various stages of the investigation.  Specifically, Rameal testified first that, on January 19, 2021, he was living in a four-bedroom apartment on the third floor of a building with David, Rashida, and their children.  The adults each had their own bedrooms, while the children shared one.  Around 1:15 a.m., he was in his room playing video

games, when he first heard a loud sound in the kitchen and, then, another loud sound from David's bedroom. He heard voices and David yelling, asking someone not to hurt him because he had children. Rameal recognized one of the voices as belonging to "Robert." Rameal checked on the children and then, dressed only in his underwear, ran outside to another apartment building for help and to call 911. His 911 call was admitted into evidence and played for the jury. In the call, Rameal apparently told the dispatcher that one of the men in the apartment was armed with a gun because he heard David say so, but Rameal never saw defendant with a gun. Rameal stated twice to the dispatcher that he did not know who broke into the apartment. When officers arrived, they instructed Rameal to wait on the second floor, while they went up to the third floor. While there, he saw defendant, for the first time, as defendant was coming down the stairs from the third floor with police behind him. Defendant tried to jump over a banister but fell down the stairwell.

¶ 11    Next, David testified that, on the date in question, he heard a bang, like someone kicking in the front door, and then someone kicked open his bedroom door. David identified defendant as the person who came into his bedroom. He was familiar with defendant and had previously met him. Further, another man whom he did not know (later alleged to be Wood) was present with defendant. Defendant held a gun, while Wood held a large knife (like a butcher knife). David testified that defendant hit him with the gun, then shoved the gun into his mouth while yelling and cursing. After beating him, defendant and Wood left to go to Larence's room, and, when he tried to follow, defendant ordered David back to his room. Wood, carrying the knife, followed David and told him that, if he moved, he would get cut. David could not call the police because defendant had smashed David's phone and tablet with the gun. Defendant later returned to David's room and hit him with the gun on his head, face, back, and body, causing a black eye and his lip to bleed.

Defendant took David's PlayStation 5 from the bedroom. David later identified defendant's picture in a photo lineup.

¶ 12    Larence testified that she was asleep in her room with the door closed, when she heard a loud boom from the front door of the apartment. She then heard a loud commotion from David's bedroom and went out into the hallway. Defendant pointed a gun at her head and instructed her to return to her room. Larence knew defendant prior to this incident. Defendant followed Larence into the bedroom and instructed her to take off her pants. Defendant fondled Larence between the legs, touching her vagina. After taking her phone, defendant returned to David's room, where Larence could hear him beating David. Wood told her to go to the children's room. Defendant later entered the children's room, telling her, "Your bitch ass baby daddy got my sister jumped." He again ordered her to pull down her pants, told her that he had been "wanting" her, and ordered her to bend over. He tried to stick his penis in her vagina but was unable to insert it. He then held the gun to her forehead, ordered her to open her mouth, and placed his penis in her mouth. Defendant took his penis out of Larence's mouth and ejaculated into his hand. Wood returned and told defendant that they had to leave because the police were coming. Police were coming up the stairs to the apartment when the men left; defendant tried to push past them. Larence later identified defendant in a photo lineup.

¶ 13    As noted, the remaining State witnesses testified to stages of the investigation. In sum, Officer Lance Reinbolz apprehended defendant running from the scene and found Larence's phone on defendant's person. Officer Matthew Lave observed Reinbolz apprehending defendant and later found a gun in bushes near where defendant was stopped. Detective Maxwell Paul photographed the scene and collected and processed evidence, including the gun. Detective Jason Goodwin processed evidence and conducted photo line-ups with the victims. Officer Nicole Folz

was first on the scene with her colleague, Officer Ehrick Howland, and encountered defendant coming out of the apartment. She ultimately tried to stop and chase him after he jumped over a banister to a lower stairwell. Jessalin Volmer, a registered nurse, examined Larence at the hospital and administered a sexual-assault evidence kit. Sergeant Ray Hernandez photographed the scene, interviewed Larence, collected DNA evidence from the victims, and took defendant's statement at the police station. Sergeant Kris Mecca collected DNA evidence from defendant. Shaya Daniels testified as a forensic scientist on latent prints (the prints lifted from the handgun were not suitable for analysis). Finally, Laurie Lee testified as a forensic scientist on DNA analysis (notably, (1) DNA found on the barrel of the handgun included David, (2) DNA found on the trigger and handgrips included defendant and Larence, (3) swabs from defendant's penis showed two DNA contributors, namely, a major profile for defendant and a minor profile from which Larence could not be excluded).

¶ 14 The court denied defendant's motion for a directed verdict. Defendant did not testify at trial, but his statement to Sergeant Hernandez was recorded and entered into evidence. Therein, defendant apparently admitted that he broke into the apartment and had a physical confrontation with David, striking him repeatedly. He claimed that he and a friend went to the apartment to confront someone about something that happened to his girlfriend, Briana Mackey.

¶ 15 Defendant called Mackey, who testified that the handgun was hers and that defendant had previously touched the weapon. Mackey's sister, Alexis Mackey, testified that one of the phones police found was hers, and she had allowed Woods to borrow it. Detective Paul and Sergeant Hernandez were both recalled and testified to the type of ammunition found in the gun's magazine. Officer Mecca confirmed that a red phone recovered during the investigation belonged to Alexis. Finally, Officer Howland testified that he arrived on the scene with Folz, activated his body cam

(the footage of which was admitted into evidence and published to the jury), kicked open the apartment door and announced himself as police, and defendant eventually came out with his hands up, but Howland did not see anything in his hands, nor did he see a PlayStation on defendant.

¶ 16     The jury found defendant guilty on all counts.

¶ 17                              C.  Posttrial Proceedings

¶ 18     Defendant filed a motion for a new trial.  Before it was heard, a presentence investigation report was prepared.  In the presentence report, the investigator reported defendant had said, "My lawyer didn't do nothing for real."  Further, in the concluding summary, the investigator noted that defendant never took full responsibility for his actions the day of his arrest, blaming instead the victim, police, "and his attorney for failing his case."

¶ 19     On May 26, 2022, defendant appeared for the sentencing hearing.  The court noted that a presentence investigation report had been filed.  It asked defendant if he had received enough time to discuss the sentencing proceedings with his counsel, and defendant replied, "No, I haven't spoke [*sic*] to him at all."  The court asked if he would like a minute to do so, and defendant replied, "No, ma'am.  Just get this over with."  The court asked defendant if he was sure, and defendant replied, "Yes, ma'am.  Just go."

¶ 20     Counsel, however, addressed the court concerning the presentence report,

> "MR. ERWIN: [noting that the last portion of the presentence report read] '[defendant] never took full responsibility for his actions the day of his arrest,' which I firmly agree with.  'Blamed the victim for lying (sexual abuse) and for the police for charging him with home invasion.  And again, he never kicked down the door.  It was open, he walked in'.  And then the last sentence 'and his attorney for failing his case'.

Obviously[,] I was the attorney that represented him on the case. I've discussed with him obviously the trial strategy and everything. I just want to make sure that he still wishes for me to proceed *for this matter* given the fact that there is that potential issue.

DEFENDANT: Go ahead, yeah.

THE COURT: First of all, I can't understand what you're saying.

Second of all, I will bring your attention to there is that part of the presentence investigation report where Amber Hiland, the probation officer, states in the report a recitation just as your attorney stated to the Court. The last words in the sentence is you're blaming your attorney for failing your case. Do you want Mr. Erwin to represent you *during this sentencing hearing*?

DEFENDANT: Yeah.

THE COURT: Yes?

DEFENDANT: Yes, ma'am.

THE COURT: Attorney Erwin, do you have anything else you want to put on the record about that?

MR. ERWIN: Judge, again, obviously the evidence and the defense that was presented I did go over that with him, spoke with him numerous times in regards to how the case and our defense strategy. Also spoke to him behind when we would be shuffled back to the holding area. I just want to again make it clear—and again, he can file any motions that he wishes to after the sentencing. But I just want to make sure that you're okay with me.

DEFENDANT: Yeah, go on.

MR. ERWIN: Well, he's indicated yes. I just want to make sure that that's still his desire.

THE COURT: When you say 'Yeah, go on', do you mean yes—

DEFENDANT: Yes, ma'am.

THE COURT: —you would like Mr. Erwin to—

DEFENDANT: I apologize. Yes, ma'am. Yes, ma'am. I mean yes." (Emphasis added.)

Thereafter, defense counsel argued the motion for a new trial, which the trial court denied.

¶ 21 Sentencing commenced. In argument, defense counsel methodically addressed each of the mitigating factors provided by section 5-5-3.1(a) of the Code (730 ILCS 5/5-5-3.1(a) (West 2020)), and, in doing so, noted each one that did *not* apply. As previously indicated, the court ultimately sentenced defendant to two consecutive terms of 30 years and two concurrent terms of 25 years, to run consecutive to the 30-year terms. Defendant appeals.

¶ 22                                      II. ANALYSIS

¶ 23                              A. Ineffective Assistance

¶ 24 Defendant argues first that trial counsel was ineffective for failing to strike juror number six. Specifically, juror number six explained that, according to his religion, and regardless of what the evidence demonstrated, if three people asserted that something happened, he had to believe them. Despite this admission that might affect impartiality, defendant argues, counsel did not move to strike the juror for cause, nor use one of his remaining peremptory challenges to exclude the juror. Defendant asserts that counsel's failure cannot be justified by any reasonable strategy, given that he knew the State would be calling more than three witnesses. Further, defendant argues that he was undoubtedly prejudiced because he is entitled to be tried by 12 impartial and

unprejudiced jurors. Where the State called 13 witnesses, 3 of whom were eyewitnesses, defendant asserts that the juror must have felt obligated to find defendant guilty without any consideration of witness credibility or other trial evidence. Defendant notes that the juror never stated that he would set aside his religious beliefs while weighing the evidence. Defendant requests that we reverse his convictions and remand for a new trial before "an unbiased and impartial jury that can return a verdict worthy of confidence." For the following reasons, we disagree because the juror was not unequivocally biased and the decision not to strike him was a matter of trial strategy.

¶ 25    It is well-established that, to state a claim for ineffective assistance of counsel, a defendant must demonstrate that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness (prong one); and (2) the defendant was prejudiced because, but for counsel's deficient performance, there is a reasonable probability that the trial result would have been different (prong two). See *People v. Jones*, 2012 IL App (2d) 110346, ¶ 68 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To satisfy prong one, the defendant must overcome the strong presumption that counsel's conduct was, under the circumstances, sound trial strategy. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). The defendant may satisfy prong two by demonstrating that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); see also *People v. Evans*, 209 Ill. 2d 194, 220 (2004) ("a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair"). Both prongs must be satisfied; if a defendant does not satisfy one prong, his or her ineffective-assistance-of-counsel claim cannot prevail. *People v. Colon*, 225 Ill. 2d 125, 135

(2007). As this ineffective-assistance claim was not raised below, we review it *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 26 A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined before trial. *People v. Manning*, 241 Ill. 2d 319, 330 (2011). A prospective juror may be removed for cause when he or she holds views that would prevent or substantially impair the ability to exercise the duties of a juror. See *People v. Buss*, 187 Ill. 2d 144, 187 (1999). Further, trial counsel may protect against prejudice by using peremptory challenges to reject a juror for real or imagined partiality. See, *e.g.*, *People v. Metcalfe*, 202 Ill. 2d 544, 562 (2002); *People v. Munson*, 171 Ill. 2d 158, 177 (1996). Generally, counsel's decisions during jury selection are considered matters of trial strategy and are virtually unassailable. *Manning*, 241 Ill. 2d at 333. Although strategic decisions are not entirely immune from ineffective-assistance claims, we remain mindful that, because attorneys consider many factors in deciding which jurors to challenge and which to accept, "[r]eviewing courts should hesitate to second-guess counsel's strategic decisions [in jury selection], even where those decisions might seem questionable." *Id.* at 335. However, trial counsel may be found deficient for failing to exercise a peremptory challenge against a juror who expresses unequivocal bias against the defendant. *Id.* at 335, 337. In assessing trial counsel's decisions regarding peremptory challenges, it is improper to focus on one answer or even a "few answers," as this approach could skew the analysis of whether counsel was deficient. *Id.* at 334. Rather, the entire *voir dire* of the juror must be considered in evaluating whether and to what extent the potential juror exhibited bias against the defendant. *Id.*

¶ 27 Thus, in considering defendant's argument here, we remain mindful: (1) that the decision whether to exercise a peremptory challenge is fundamentally a matter of trial strategy, and (2) we

must assess the totality of juror six's responses in determining whether he was unequivocally biased such that counsel acted outside the realm of sound trial strategy in failing to strike him. As such, when we consider the totality of the *voir dire* involving juror six, we cannot agree that he was unequivocally biased or that his views substantially impaired the performance of his duties as a juror, such that counsel performed deficiently in failing to seek his dismissal. During the general *voir dire* of the panel, juror six acknowledged that he understood and accepted that: (1) defendant was presumed innocent; (2) the State must prove defendant guilty beyond a reasonable doubt; (3) defendant was not required to offer any evidence on his own behalf; and (4) if defendant chose not to testify, that decision could not be held against him. Further, while he explained that his religious beliefs "might affect a bit" and that, if three or more people testified that a person did something, he had to accept that as true, regardless of the evidence, upon further questioning he nevertheless twice reiterated that he would remain fair and, if the State did not prove defendant's guilt beyond a reasonable doubt, would sign a not-guilty verdict. Thus, based on the entire *voir dire* of juror six, we do not believe that he was unequivocally biased or prejudiced regarding the case itself or, more specifically, defendant's guilt.

¶ 28    Although defendant focuses on the fact that the juror never commented that he could be impartial and would set aside his religious beliefs to weigh the evidence (see, *e.g.*, *People v. Hobley*, 159 Ill. 2d 272, 297 (1994) (if the prospective juror states that he or she will try to disregard the bias, striking the juror unnecessary)), we believe that juror six's repeated statement that he would be fair, coupled with his answers in the context of the *entire voir dire*, reflect that he was nevertheless not predisposed to find defendant guilty. Indeed, and most critically here, given that we are reviewing defendant's arguments in the context of an ineffective-assistance analysis, it was certainly possible that *counsel* did not consider the juror unequivocally biased against defendant

or incapable of impartiality. See *Manning*, 241 Ill. 2d at 335 ("Considering the entire *voir dire* of [the potential juror] in context, it is possible that defendant's trial counsel decided that [the juror] was not unequivocally biased."). Again, the juror's answers to various questions about bias and fairness during the entire *voir dire* reflect that the primary issue was whether juror six would credit and accept three witnesses' testimony, even over contrary evidence, which, frankly, was not an issue here. While it is true that more than three witnesses testified for the State, this is not a case where three State witnesses testified to the exact same thing, but the remaining evidence *contradicted* them, which is where juror six's religious beliefs could, theoretically, have been problematic. Indeed, given the witness list and evidence likely to be elicited, counsel presumably understood that it was unlikely that the juror's religious beliefs about accepting three witnesses' testimony, regardless of the evidence, would be triggered. Further, we note that, after asking the juror several questions, counsel asked the court for a minute to reflect. Counsel then asked the juror a few additional questions, confirming that the juror would hold the State to its burden of proof, before accepting him. As such, counsel's decision not to strike the juror was clearly one made after considering the juror's answers, the potential evidence, and upon strategic contemplation.

¶ 29    Moreover, we note that counsel knew that if he used another peremptory challenge on juror six, he would have only one remaining for five more prospective jurors (one more juror in the second panel and the entire third panel of prospective jurors). Counsel may have reasonably assessed that no three witnesses would be testifying to the exact same events and that, given the juror's repeated assurances that he would be fair, it was better to reserve those challenges for the next panel. Defendant asserts that, while counsel may have wished to save as many peremptory challenges as possible for as long as possible, juror number six was the kind of juror he should

have been saving them for, because "it is difficult to imagine a juror more damaging for [defendant's] case, where the State called more than three witnesses to testify that he was the perpetrator, than a juror who admitted he would ignore the evidence and simply believe [defendant] was the perpetrator if three or more people testified to that effect."  Again, we disagree with defendant's characterization of juror six's statements as reflecting unequivocal bias against him, particularly in light of the entirety of his *voir dire* answers and the potential (and actual) evidence.  Moreover, defendant also disregards the degree to which counsel's strategic decisions are unassailable, as well as the fact that, on review, we have the benefit of hindsight, which is not an appropriate factor to consider.  See *Jones*, 2012 IL App (2d) 110346, ¶ 83 ("neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates that defendant counsel was incompetent.").   In the moment, and at the time counsel made his strategic decision to accept juror six, so as to not leave only one peremptory challenge remaining for questioning five more jurors, it was simply not objectively unreasonable. We will not second guess counsel's decision.  *Manning*, 241 Ill. 2d at 333, 33-36 (finding not unreasonable the attorney's decision to reserve his two remaining peremptory challenges for the three jurors yet to be seated).

¶ 30     We further note that our supreme court has found a defense counsel's failure to remove a juror to be a matter of trial strategy even when the juror made *considerably* stronger statements of bias or partiality than those here. See *Jones*, 2012 IL App (2d) 110346, ¶¶ 74-75 (citing *Manning*, 241 Ill. 2d 319; *People v. Metcalfe*, 202 Ill. 2d 544 (2002)). As noted in *Jones*, the *Manning* court held that, despite the potential juror giving conflicting answers about his impartiality, eventually claiming that he could *not* be fair, it was possible that the defense counsel decided that the juror was not unequivocally biased.  *Jones*, 2012 IL App (2d) 110346, ¶ 74 (citing *Manning*, 241 Ill. 2d

at 335). In *Jones*, we found no ineffective assistance where the attorney did not move to strike a juror who stated that he thought police would be more credible than other witnesses. *Jones*, 2012 IL App (2d) 110346, ¶ 73. In doing so, we also cited *Metcalfe*, 202 Ill. 2d 544, where the supreme court held that, despite responses by a potential juror that she could *not* be impartial because of her experience as a crime witness, the defense counsel's decision not to remove her could be considered trial strategy because counsel possibly believed that the juror's bias might be against the criminal justice system, thus, favoring the defense. *Jones*, 2012 IL App (2d) 110346, ¶ 75 (citing *Metcalfe*, 202 Ill. 2d at 562). We find unpersuasive defendant's attempts to distinguish those cases. Here, juror six's statements simply did not approach the degree of bias or lack of impartiality expressed by the jurors in *Manning* and *Metcalfe*—which failed to support those ineffectiveness claims. Further, unlike in *Jones*, juror six's comments here did not outright announce an inclination to find State witnesses more credible which, again, failed to support the ineffectiveness claim. The same result is warranted here, and we find that counsel's performance did not fall below an objective standard of reasonableness.

¶ 31    Although we need not address prejudice, as we have found counsel's performance was not deficient, we briefly note that defendant's argument regarding prejudice suggests that, if it is determined that counsel was deficient for not striking a biased juror, prejudice must be presumed because the defendant will have been deprived of an impartial jury. However, that presumption was rejected by our supreme court in *Manning*, and the court instead reinforced the standard that a defendant must still demonstrate prejudice in that the deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Manning*, 241 Ill. 2d at 327-28, 333. Here, even if we were to find counsel's performance deficient, defendant's ineffective-assistance claim fails, because he has not demonstrated counsel's performance rendered the trial result

unreliable or the proceeding fundamentally unfair. Defendant notes that, because more than three witnesses testified, juror six must have felt bound to convict him. However, the evidence of defendant's guilt was *very* strong, even *despite* juror six's convictions. In sum, we reject defendant's ineffective-assistance claim.

¶ 32                               B. Preliminary *Krankel* Inquiry

¶ 33    Next, defendant argues that the court erred where it failed to conduct a preliminary *Krankel* inquiry to assess the bases of his *pro se* claims of ineffective assistance of counsel. He notes that the court was aware of his statements in the presentence report reflecting his belief that trial counsel had failed his case. Further, the court learned that he had not had time to discuss sentencing with his counsel because counsel had not contacted him. Moreover, defendant asserts that, during the sentencing hearing, counsel made disparaging comments about him, where he "firmly agreed" with the presentence report's conclusion that defendant had not taken responsibility for his conduct, and where counsel enumerated for the court each of the mitigating factors that he believed did *not* apply to defendant's case. Thus, defendant argues, just prior to sentencing, counsel informed the court that the presentence investigator made a damaging conclusion about defendant, that counsel firmly agreed with that conclusion, and further highlighted the lack of applicable mitigating evidence. Nevertheless, despite the statements in the report and the additional "red flags" at the hearing reflecting "counsel's subsequent abandonment of his duty to advocate for his client," the court did not conduct any investigation into defendant's complaints about counsel, asking *only* whether defendant wanted counsel to represent him during the sentencing hearing. Defendant requests that we remand the case for a preliminary inquiry into defendant's *pro se* allegations of ineffective assistance. For the following reasons, we agree.

¶ 34    When a defendant brings a *pro se* posttrial claim that trial counsel was ineffective, *Krankel* requires the trial court to adequately inquire into the factual basis of the claim and, under certain circumstances, to appoint new counsel to argue the claim. *People v. Ayres*, 2017 IL 120071, ¶ 11. The purpose for requiring the court to examine the factual basis of a defendant's claim is to assess whether new counsel should be appointed; namely, if the court determines that the claim lacks merit or pertains only to matters of trial strategy, the court may deny the *pro se* motion, whereas, if the allegations show possible neglect of the case, new counsel should be appointed. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). The trial court's duty to inquire is triggered when a *pro se* defendant simply brings his or her claim to the trial court's attention; nothing more is required. *Ayres*, 2017 IL 120071, ¶ 11. Specifically, the defendant does not need to use the words "ineffective assistance of counsel," nor allege the underlying factual basis for the claim, to trigger the court's duty to inquire. Further, a defendant's statements alleging ineffectiveness that are included in a presentence investigation report and are brought to the court's attention are sufficient to trigger the inquiry requirement. *People v. Craig*, 2020 IL App (2d) 170679, ¶¶ 18-19. Moreover,

"The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. During this evaluation, some interchange between the trial court and trial counsel *regarding the facts and circumstances surrounding the allegedly ineffective representation* is permissible and *usually necessary* in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. A brief discussion between the trial court and the defendant may be sufficient. Also, the trial court can base its evaluation

of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." (Emphases added.) *Moore*, 207 Ill. 2d at 78-79 (internal citations omitted). If the court failed to conduct a preliminary examination regarding the factual basis of the defendant's allegations, the case must be remanded for the limited purpose of allowing the court to do so. *Craig*, 2020 IL App (2d) 170679, ¶ 13. We review *de novo* a trial court's alleged failure to inquire into a claim of ineffective assistance of counsel. *Id.*

¶ 35    Here, the trial court indicated that it had received the presentence investigation report. In that report, the investigator twice noted that defendant believed his trial counsel did nothing and that he blamed counsel for his conviction. While those facts alone should be sufficient to trigger the preliminary inquiry, trial counsel also expressly brought those allegations to the trial court's attention prior to sentencing. The State characterizes the subsequent exchange as the court providing defendant with the opportunity to flesh out his claim, but defendant simply refusing to seize the opportunity. We disagree. In fact, after bringing to defendant's attention the statement in the investigation report about his counsel failing his case, the court conducted no inquiry into the factual *bases* for defendant's allegations about counsel's performance; it simply repeatedly asked defendant whether he wanted counsel's continued representation at *sentencing*. While defendant answered affirmatively, we do not agree with the State that defendant's acceptance of counsel's representation at sentencing, when that hearing was about to commence, excuses the court's failure to inquire into the bases for defendant's belief that he received ineffective assistance of counsel *at trial*. Even at this juncture, the record is devoid of the bases for defendant's allegations.

¶ 36     The State also argues that an adequate inquiry was conducted because, despite the court's repeated questions to defendant about whether he wanted counsel to represent him, as well as the fact that counsel mentioned summarily what he did for defendant at trial, defendant did not speak up to disagree with counsel or to otherwise assert his allegations of ineffectiveness.  We reject this argument, as our supreme court rejected a similar argument in *Moore*, reiterating that a defendant need not do more than bring his or her claim to the trial court's attention.  *Moore*, 207 Ill. 2d at 79 (rejecting the State's argument that the defendant waived his argument that the court failed to conduct a proper inquiry into his ineffective-assistance claims because the defendant and his counsel "stood mutely and did nothing to request further inquiry.").  Further, as we noted above, it is not as if the court asked defendant about the allegations in the report and he did not respond. Rather, the court mentioned the statement in the report and then asked whether he wanted counsel's representation at *sentencing*.  Moreover, although counsel summarized his trial representation, he, too, did so in the context of questioning whether defendant wanted his continued representation at sentencing, despite "that potential issue."  There was no question posed to defendant about whether he agreed with counsel's representations of his own performance, nor anything in the hearing that offered defendant the opportunity to discuss his ineffective-assistance claims.

¶ 37     Moreover, we disagree with the State that, because it may base its assessment of the ineffective-assistance claims on its own knowledge of the prior proceedings and defense counsel's performance, the court here adequately considered defendant's allegations. While that concept might be true generally, it does not work here, as the court did not know the bases for defendant's claims and, thus, its knowledge of prior proceedings might not have sufficed. See, *e.g.*, *People v. Peacock*, 359 Ill. App. 3d 326, 339-40 (2005) (where no record was made regarding the defendant's claims of ineffective assistance of counsel, the trial court was not necessarily in a

position to evaluate all of the ineffective assistance claims simply by relying on facts within its knowledge).

¶ 38    Finally, the State mentions that, immediately prior to trial and jury selection, the court asked defendant whether there was anything else he wanted his attorney to do before trial started, and defendant said, "No." From this, the State surmises that defendant was, therefore, "merely blowing off steam to the investigator" in the presentence report, due to his disappointment over his convictions, and defendant had no legitimate basis for a claim that defense counsel failed his case. This argument borders on frivolous. Obviously, as defendant points out, any number of things could have transpired later, during trial, that might have given rise to defendant's ineffective-assistance claims. The point is, based on the lack of inquiry by the court, it is impossible to know.

¶ 39    In sum, the trial court did not conduct a sufficient inquiry to determine what defendant's ineffective-assistance claims were and if they showed possible neglect. We remand to the trial court for the limited purpose of conducting a preliminary *Krankel* inquiry into defendant's *pro se* allegations of ineffective assistance of counsel and whatever may ensue thereafter.

¶ 40                                    III. CONCLUSION

¶ 41    For the reasons stated, we remand the cause for the limited purpose of allowing the trial court to inquire into the factual basis of defendant's ineffective-assistance claim. If defendant's allegations show possible neglect of the case, the court should appoint new counsel to argue defendant's claim of ineffective assistance. However, if the court concludes that defendant's claim lacks merit or pertains only to matters of trial strategy, the court may deny the claim.

¶ 42    Remanded.