2025 IL App (2d) 240332-U
No. 2-24-0332
Order filed April 6, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* C.G., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County |
| | ) | |
| | ) | |
| | ) | No. 20-JA-193 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Brenda R., Respondent- | ) | Kathryn D. Karayannis |
| Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Appellant's appointed counsel is granted leave to withdraw where she demonstrated that there were no non-frivolous issues to raise on appeal. Affirmed.

¶ 2   Appellant, Brenda R., appeals the April 24, 2024, order terminating her parental rights with respect to C.G., a minor. Her second appointed appellate counsel[1] has moved to withdraw pursuant

---

[1]First appointed appellate counsel previously appeared in this matter on behalf of DCFS. On this court's own motion, the cause was remanded on October 23, 2024, for appointment of new appellate counsel, as first appointed appellate counsel was operating under a *per se* conflict of interest. Second appointed counsel was appointed on October 24, 2024.

to *Anders v. California*, 386 U.S. 738 (1968). See *In re Alexa J.*, 345 Ill. App. 3d 985 (2003) (holding that Anders applies in termination of parental rights cases and outlining the procedure to be followed when appellate counsel seeks to withdraw). Counsel alleges that after a full examination of the record, she has failed to find any non-frivolous issue that could potentially be raised. On January 28, 2025, second appointed appellate counsel served Brenda with a copy of the motion to withdraw.[2] Brenda did not file a response, despite receiving notice. For the reasons detailed below, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4      The State first filed a petition for adjudication on November 25, 2020, requesting that the trial court adjudge C.G. to be neglected, and that she be made a ward of the court.[3] That same day, the matter proceeded to temporary custody hearing, wherein Brenda stipulated that the State's witnesses would testify to the following factual basis:

> "that Minor's sibling was discharged from Riveredge Hospital in October of 2020. Mother had issues following up with her medical care. Minor's sibling had made allegations of sexual abuse and then recanted. She was then left with an adult male relative in a hotel room with one bed. Minor's sibling returned to mother's home, but then left at night and went to the home of a neighbor whom she did not know and told him that she did

---

[2]Second appointed counsel originally filed her notice of filing and certificate of service on December 12, 2024. However, Brenda was not served. This court entered an order requiring second appellate counsel to provide service to Brenda and allowed Brenda 30 days from the date of service to file a response to the motion.

[3]The State's petition also involved C.G.'s father, Javante G. As he has not appealed, only facts relevant to C.G.'s mother, Brenda R., will be summarized.

not feel safe at home. *** Mother failed to let agency see Minor when Minor's sibling was taken into protective custody."

¶ 5 On that basis, along with supporting testimony from Emily Bahrke from Bethany Christian Services, temporary custody of C.G. was awarded to the Guardianship Administrator of the Illinois Department of Children and Family Services (DCFS). CASA Kane County was appointed as Guardian *ad Litem* (GAL) to represent C.G., with Nydia Molina and Chris Geocaris appointed as attorneys for the CASA/GAL.

¶ 6 The State filed two amended petitions for adjudication and the matter ultimately proceeded to an adjudication hearing on April 15, 2021. C.G. was adjudged neglected because she was in an environment that was injurious to her welfare and was unsupervised for an unreasonable period of time. See 705 ILCS 405/2-3(1)(b), (d) (West 2024). Brenda was admonished that she must comply with the terms of the service plan set by DCFS. The matter was then continued to May 13, 2021, for dispositional hearing.

¶ 7 On that date, Brenda waived her right to a hearing and the initial permanency goal was to return C.G. home within 12 months. Under the DCFS Client Service Plan (CSP), Brenda was required to complete the following services: (1) complete a parenting education class, (2) engage in parent coaching, (3) attend psychotherapy sessions, (4) be open and honest about past abuse and trauma, (5) attend psychiatrist appointments, (6) take psychotropic medications as prescribed; (7) consistently visit with C.G., (8) maintain positive behaviors and communications with C.G., (9) communicate with DCFS or foster parent within 24 hours should visitation need to be canceled, (10) complete a substance abuse assessment and follow through with any recommendations, (11)cooperate with random urine drops; (12) cooperate with current probation order, (13) sign consent forms to enable DCFS and probation to communicate, (14) provide documentation

showing participation in services as requested, (15) complete a domestic violence consultation and follow through with any recommendations, and (16) engage in family counseling with Brenda's older daughter, J.R.

¶ 8     The matter was continued to August 12, 2021, for status of services. The trial court reviewed the reports from DCFS and CASA. Brenda was working with a psychiatrist, engaging in a partial hospitalization program (PHP), and attending parenting classes when not hospitalized. However, she was not signing consent forms needed by DCFS and was failing to attend random drug drops. Additionally, Brenda still needed to complete the substance abuse assessment and follow treatment recommendations, complete individual therapy, and complete family therapy with J.R. when deemed appropriate.

¶ 9     The matter was continued to November 19, 2021, for permanency hearing. A new service plan was also created and filed, which included all previous services and added the requirement that Brenda maintain safe, adequate, and clean housing. The trial court reviewed the new plan along with the reports from DCFS and CASA. Although Brenda had completed the parenting class and was attending individual therapy, she had not completed parenting coaching, was not allowing caseworkers or her probation officer into her home, and had reported using ecstasy on Halloween. Brenda was also not compliant with her probation, had not completed the domestic violence or substance abuse assessments, and was not reporting for drug drops. There was conflicting information about whether or not Brenda was visiting C.G. regularly. According to Brenda, she was consistently visiting C.G. approximately once a week. C.G.'s foster parent disagreed with this, and said that Brenda had only visited C.G. four times since she had come to live with him on January 15, 2021. The trial court found that she had not made reasonable efforts nor substantial

progress towards the return home goal. The permanency goal was changed to return home pending status hearing.

¶ 10    The matter was continued to March 10, 2022, for permanency hearing. The trial court reviewed the reports from DCFS and CASA and found that although Brenda had made some efforts, they were neither reasonable nor substantial. Parenting coaching, substance abuse and domestic violence assessments remained outstanding. Visitation remained inconsistent and no documentation was available to show Brenda's progress in individual therapy. Additionally, Brenda was not participating in drug drops, but that was because DCFS had not scheduled the drops. The issue was worked out, with drops being scheduled for April with a ride to the drops being procured for Brenda. The trial court set the permanency goal as return home within 12 months.

¶ 11    The matter was continued to June 28, 2022. The record on appeal does not contain the transcript from that hearing, but a permanency order was entered. Brenda was found not to have made reasonable efforts or substantial progress. Her home was not clean or appropriate, she was abusing her medication, and she had not yet completed parenting coaching. She also had not completed the substance abuse assessment and tested positive for marijuana, methamphetamines, and benzodiazepines. Brenda successfully completed the domestic violence assessment and was recommended to engage in domestic violence victim services. The permanency goal was set as return home within 12 months.

¶ 12    The matter was continued to September 13, 2022, for status of services. The trial court noted concerns about Brenda's lack of progress. She tested positive for cocaine at a recent drop and also missed several other drops.

¶ 13   The matter was continued to December 22, 2022, for permanency hearing. The trial court reviewed the reports from DCFS and CASA. Brenda had started her parenting coaching and alleged she had started domestic violence victim services, but no documentation was ever provided showing this. Brenda's individual therapy record was also spotty, because little to no documentation from her self-selected provider has been made available. Brenda tested positive for cocaine in August, September, and November. She denied taking cocaine, instead suggesting that one of her prescribed medications was causing a false positive. The DCFS caseworker spoke to Brenda's primary care physician, who indicated that none of Brenda's prescribed medications would cause a false positive. The trial court found that Brenda had not made reasonable efforts or substantial progress and set the permanency goal as return home within 12 months.

¶ 14   The matter was then continued to April 12, 2023, for permanency hearing. Brenda had completed domestic violence victim services. She was also engaged in parenting coaching, but was resistant to it and didn't seem to be progressing. Additionally, she was picked up on an outstanding warrant and was testing positive for cocaine at drops and at a pain clinic she attended. The permanency goal changed to substitute care pending termination of parental rights

¶ 15   The State then filed a petition for termination of parental rights on August 28, 2023, alleging the following:

> "7. The respondent mother, Brenda [R.], is an unfit person to have a child in that:
>
> A. She failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, pursuant to 750 ILCS 50/1(D)(b);
>
> B. She failed to protect the child from conditions within her environment injurious to the child's welfare, pursuant to 750 ILCS 50/1(D)(g);

C. She has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent, during the nine (9) month period from April 16, 2021 through January 16, 2022, after an adjudication of neglect and abuse under the Juvenile Court Act, pursuant to 750 ILCS 50/1(D)(m);

D. She has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent, during the nine (9) month period from January 17, 2022 through October 17, 2022, after an adjudication of neglect and abuse under the Juvenile Court Act, pursuant to 750 ILCS 50/1(D)(m);

* * *

9. It is in the best interest and welfare of the said minor that the parental rights of mother, Brenda [R.], and father, Javante [G.], be permanently terminated with respect to the minor, and that the Department of Children and Family Services remain legal guardian and custodian of the minor, with the power to consent to the adoption of the minor."

¶ 16    The State's petition for termination proceeded to fitness hearing on October 3, 2023. Javante G., C.G.'s biological father, testified first. He testified that he was the father of C.G., who was born on December 19, 2018. She was taken into protective custody in either 2020 or 2021. At some point, he was contacted by "Ms. Carla" from DCFS, who advised him he would need to complete various services in order to regain custody of C.G. Javante believed those services included a psychological evaluation and a parenting class. He indicated that he had completed the psychological evaluation but was never sent any information about the parenting class. He generally expressed frustration and disdain for DCFS, the court, and C.G.'s mother, as he felt he

was not adequately communicated with throughout the process. He also testified that he has not made any effort to communicate with or visit C.G.

¶ 17 Once Javante's testimony concluded, the trial court took a recess. Brenda lost Zoom connection at this point. The trial court continued the hearing in her absence and she rejoined the hearing in the middle of Tina Varney's testimony.

¶ 18 Tina Varney, a caseworker with DCFS, testified next. She testified that she supervised C.G.'s case for approximately five weeks in 2021. She created one service plan during this time, dated November 17, 2021. There was a previous service plan completed November 1 or 7. However, this plan did not take into account the lack of progress and uncompleted tasks from the May 2021 service plan, which is why Tina created the November 17, 2021, plan. Due to the lack of progress Brenda had made, the tasks included in the November 17, 2021, service plan were the same as previous plans with the added component of Brenda providing a suitable, clean living arrangement.

¶ 19 In the middle of Tina's testimony, the trial court reprimanded Brenda for walking around and moving her device while in the hearing.

¶ 20 Tina's testimony continued. She could not recall specifically if she had provided Brenda with a copy of the November 17, 2021, service plan. However, she met with Brenda in November to review all of the conditions of the service plan. These conditions included: completing parenting classes, parenting coaching, individual therapy, family therapy, and medication management; cooperating with probation; maintaining a suitable, clean living arrangement; staying sober; undergoing drug testing; behaving appropriately during visitation and contact with her daughters; and cooperating with a domestic violence consultation.

¶ 21      Tina believed that Brenda completed the domestic violence consultation but does not know what recommendations were made. Brenda completed parenting classes in September 2021. She did not complete parenting coaching. Regarding Brenda's home, she would not allow Tina to enter the apartment as she said it was in "disarray."

¶ 22      While Tina was supervising the case, Brenda attended therapy. She was unsure as to frequency, as the therapist did not respond to requests for information while Tina was supervising the case. Tina sent Brenda for a drug drop in the third week of November 2021. The test was positive for tetrahydrocannabinol (THC). Brenda's probation officer also advised Tina that she had refused a drug drop because she had taken ecstasy on Halloween.

¶ 23      Brenda visited C.G. only four times between March 2021 and November 2021. These visits were supervised. Tina did not request unsupervised visits for Brenda while she supervised the case because "[they] were not at that point."

¶ 24      Tina's testimony was again interrupted as the trial court observed another individual in the room with Brenda. She denied anyone being in the room with her, responding to the trial court by saying: "You seen me looking for Tylenol because this is giving me a headache." The trial court acquiesced, but made clear for the record that it believed it saw someone in the doorway of the room Brenda was in. Brenda responded by saying: "Well, maybe you need glasses." The trial court reprimanded her and then allowed Tina's testimony to continue.

¶ 25      Brenda had advised Tina that she saw C.G. every week, or every other week. This was at odds with the information Tina had received from C.G.'s foster parent. Tina's testimony concluded and the matter was continued to February 28, 2024.

¶ 26      Nicholas Nasuta, a caseworker with DCFS, testified next. He was assigned to the case in February of 2022 and had been on the case since, except for a period he was on leave from July

2022 to October 2022. The service plan he created for Brenda was substantially similar to those previously created. Services included mental health treatment (individual therapy, seeing a psychiatrist, and complying with her medications), domestic violence services, substance abuse services, and parenting classes and coaching.

¶ 27 Regarding mental health treatment, Brenda was diagnosed with bipolar disorder, kleptomania, generalized anxiety disorder, and depression. Tina testified that in 2021, Brenda had been hospitalized for her mental health two to three times, with an additional partial hospitalization occurring in September 2021. When Nicholas was initially assigned the case, Brenda was attending individual therapy through a non-DCFS provider. This was discontinued in August 2022. She then sought a DCFS referral in October or November 2022. Nicholas provided her a referral to Pathways Psychiatry. She attended sessions regularly until February or March 2023, and then discontinued services in July 2023. Brenda was never successfully discharged from individual therapy through any provider.

¶ 28 Tina testified that to her recollection Brenda successfully completed domestic violence services sometime in late 2022 or early 2023. Brenda completed the substance abuse assessment through Breaking Free in June 2023. They did not recommend further treatment, however, DCFS reached out to them to advise of positive drops and Breaking Free advised they would do another assessment. The second assessment was never done because Kane County probation services were discontinuing their courtesy supervision due to an outstanding warrant in La Salle County. In addition to testing positive for cocaine and methamphetamines on some drops, Brenda was also inconsistent in attending the drops in generally. Nicholas testified her attendance was about "50/50."

¶ 29    Regarding parenting classes and coaching, Brenda completed the classes in September 2021. There was some issue getting a referral for parenting coaching, but Nicholas was able to provide her with a referral to Pathways Psychology in November 2022. She was never successfully discharged from parent coaching. She eventually discontinued the service.

¶ 30    Regarding visitation, initially, Brenda and C.G.'s foster parent were coordinating visits on their own. There was conflicting information as to how regular those visits were. Brenda said she was visiting weekly. C.G.'s foster parent indicated she had only visited four times between January and November 2021. In late spring, early summer 2022, a referral was made for supervised visits. From February 2022 until that referral was made, there were no visits made. Once supervised visits started occurring in late spring, early summer 2022, Brenda for the most part attended those visits with C.G.

¶ 31    Nicholas concluded his testimony and the matter was continued to April 23, 2024, for continued termination hearing. The State rested, CASA declined to present any witnesses on the fitness issue, and then Brenda's counsel presented her as a witness.

¶ 32    Brenda testified that should C.G. be returned to her, there would be a bedroom available to her in the two-bedroom condo where she lives. At the time of the hearing, she was not working because she was disabled. She has bipolar II disorder, severe anxiety, depression, PTSD, and kleptomania. She also had broken her humerus and fractured her spine. She takes Gabapentin, Seroquel, Xanax, Adderex, and Wellbutrin.

¶ 33    Brenda testified that the original caseworker on her case was Carla Gallman, who never told her what services needed to be completed. Nor did she answer Brenda's calls or respond to any messages that she left. After 18 months with little to no contact from the caseworker, Nicholas Nasuta became her caseworker. He was much more hands on and responded to Brenda's calls.

Brenda was unable to do services in those initial 18 months because no one had ever corresponded with her regarding a service plan. Once Nicholas was assigned, she received the service plan multiple times, as she misplaced it a few times. She initially received the service plan in late 2022 or early 2023.

¶ 34    When Nicholas was assigned the case, he set up visitation with each child for four hours a week. Brenda testified that she never missed visitation, because Nicholas had set up rides for her. She also completed parenting classes but could not remember when. Regarding parenting coaching, the coach made her and C.G. uncomfortable. Additionally, there were scheduling issues and the coach could not make it to scheduled visitations. In total, she only saw the parenting coach six times. She was unsure as to how many times the coach canceled on her. She notified Nicholas of the issues she was having with the coach and requested a new one.

¶ 35    Regarding individual therapy, Brenda testified that she had been seeing a therapist regularly since she was 16. Since the inception of this case, she has been seeing Erin Duffey with Ascension Mercy for therapy. She signed a release of information form for Nicholas to be able to access her therapy records. She also sees a psychiatrist every six to eight weeks to monitor her medications.

¶ 36    Brenda testified that she is currently on probation in DuPage County. She is in the Mental Health Program, which is a specialty service for defendants whose crimes are linked to their mental illness. As part of this program, she provides a urine drop twice a week so they can ensure she is taking her medications and test for illicit substances. She has never tested positively for alcohol or drugs since entering the program.

¶ 37    Brenda did complete a substance abuse evaluation and no further recommendations were made. She was asked to do a drop once while Carla was her caseworker, but she called her the

day-of and Brenda was on her way to the city and unable to make the drop. When trying to coordinate with Carla, the call dropped. Brenda testified that the next time someone asked her to do a drop was shortly after Nicholas was assigned to her case. She had some issues with rides because she is disabled. Nicholas drove her a few times but told her she needed to handle her own affairs. She did test positive, but that was due to her not knowing what to do with herself and being upset about her children being taken away. She was also influenced by the group around her. She has since cut that group out and is better for it. Brenda testified that she was never asked to do a follow up assessment for substance abuse.

¶ 38    Brend did complete domestic violence counseling a year earlier. She provided documentation to Nicholas.

¶ 39    Regarding the condition of her home, she testified that Nicholas "never puts [her] in a good light." The first time he visited, she was in a deep depression. She does not remember that visit. He visited several other times and her home was clean, thanks to her home aid.

¶ 40    Brenda also testified that although she has a home aid help her with things around the house Monday through Friday, she would be able to care for C.G. on her own, both physically and financially. She also testified that she believed she had done everything she needed to do in order to have C.G. returned to her care.

¶ 41    On cross-examination, Brenda was combative. At times, arguing with counsel and refusing to answer questions. She also testified that although she had not participated in a substance abuse program, she got help from saints. When asked more about this, she testified:

> "Saints that are considered saints. My grandmother, her friend, other praying
> mothers and grandmothers, actual, real saints and evangelists. I can't give you a list right
> now, but I was prayed over several times, several times, and that spirit, the addition spirit,

that party spirit, that mean spirit, that unsure spirit, it was rebuked from me and I no longer possess those."

¶ 42 Javante G. testified next. Although his testimony is not relevant to this appeal, it is important to note that Brenda interrupted his testimony. At one point during his testimony, she lit what appeared to be a cigarette or incense. When instructed to extinguish it, she was not cooperative. She did eventually extinguish the object.

¶ 43 Once Javante concluded his testimony, the parties proceeded to closing arguments. Brenda also interrupted closing arguments.

¶ 44 The trial court found that Brenda was unfit as alleged in paragraphs 7a, 7b, 7c, and 7d of the State's petition. While making its ruling, Brenda left the Zoom call. Once she rejoined, she also interrupted the trial court several times. She was warned if she interrupted again she would be removed from the Zoom call. Towards the end of the trial court's ruling, Brenda began laughing at the trial court and was removed from the Zoom call. The trial court's written ruling read as follows:

"Ms. [R.] has not maintained a reasonable degree of interest, concern, or responsibility. She has not successfully completed her services or made progress in those services. She did not regularly visit the minor, and there were periods of time she wasn't visiting. She never progressed to unsupervised visits due to her lack of progress in her services. At one point, her housing was deemed inappropriate as it was unsanitary, and she would not let people into her residence. She did not maintain appropriate housing. Ms. [R.] failed to protect the minor. She was involved in intact services, and she was not successful in completing services and did not sufficiently address the mental health concerns. She did not make reasonable progress toward the return home of the minor during the stated nine-

month periods. She was psychiatrically hospitalized and engaged in a partial hospitalization program upon her release. But, she did not complete the program as she reported that she forgot to go. She did not complete parent coaching, her mental health services, or her substance abuse services. She engaged in mental health services, but she did not make substantial progress in those services. There was a period of time that she was not in individual therapy. Her visits never expanded to unsupervised visits, and the services she did not do were important."

¶ 45 The matter then proceeded to best interest hearing. The State offered the CASA GAL best interests report into evidence, which was admitted without objection. The report indicated that C.G. was in a safe environment and appears at the correct level of development for a four-year-old. C.G. has a strong relationship with the foster parent and has a connection with his extended family as well. He is also willing to adopt. The report indicated that it would be in C.G.'s best interest for Brenda's parental rights to be terminated.

¶ 46 The State then called Nicholas Nasuta to testify. He testified that C.G. has been with her foster father since January 2021. The home is safe and appropriate, with C.G. having her own bedroom. He has observed them together and believes them to have a pretty good bond. It would be in C.G.'s best interests to be free for adoption.

¶ 47 The parties proceeded to argument. After argument, Brenda's attorney indicated that Brenda wished to be allowed back on the Zoom call. The trial court denied this request. The trial court then found that it would be in C.G.'s best interests to terminate Brenda's parental rights.

¶ 48 On April 24, 2024, the trial court entered an order terminating Brenda's parental rights. Brenda filed her timely notice of appeal on May 22, 2024. Pursuant to Illinois Supreme Court Rule 311(a), our decision was to be issued 150 days after the filing of the notice of appeal, or by October

21, 2024. See Ill. Sup. Ct. R. 311(a) (eff. Jul. 1, 2018). However, given the conflict issue with first appointed appellate counsel (see *supra* ¶ 2 n.1) and the service issue with second appointed appellate counsel (see *supra* ¶ 2 n.2), we have good cause for filing our decision beyond the deadline.

¶ 49                                    II. ANALYSIS

¶ 50     Under the procedure outlined in *Anders*, a motion to withdraw must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744. In termination-of-parental-rights appeals, counsel should state in the argument portion of the *Anders* brief that he or she has reviewed both the finding of unfitness and the best interests determination. *In re Alexa J.*, 345 Ill. App. 3d at 989. Here, second appointed appellate counsel seems to combine her motion and accompanying brief. Although not technically correct, substantively, the document complies with the *Anders* procedural requirements. Counsel indicates that after a full examination of the record, she has identified three potential issues for review, but ultimately concludes each is without merit (1) that trial counsel was ineffective for failing to call certain character witnesses suggested by Brenda R., (2) that the trial court erred in finding that Brenda R failed to maintain a reasonable degree of interest, concern, and responsibility towards C.G., and (3) that the trial court erred in determining that termination of Brenda R.'s parental rights was in C.G.'s best interest. We agree.

¶ 51     We address the potential ineffective assistance of counsel claim first. In order to successfully prove ineffective assistance of counsel, a defendant must show both that (1) defense counsel's assistance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As a

general rule, counsel's performance is strongly presumed to be reasonable. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 52    On January 24, 2024, Brenda indicated to the trial court that she was unhappy with her appointed counsel. Specifically, that she had given him a list of character witnesses and he had not contacted them. First appointed appellate counsel asked Brenda for those witnesses, and Brenda was unable to name any. Although a failure to investigate and call certain witnesses can constitute ineffective assistance of counsel, there must be more than just the allegation that such witnesses exist. See *People v. Hodges*, 234 Ill. 2d 1, 21. Without knowing more, such as who these witnesses would be and what they would testify to, we cannot find that trial counsel's failure to call them was objectively unreasonable.

¶ 53    In looking at Brenda's trial counsel's performance on the whole, we are also unable to say that it was objectively unreasonable. He zealously advocated for her throughout the proceedings. At the termination hearing, he effectively cross-examined witnesses and also solicited testimony from Brenda showing her care and concern for C.G., which the trial court noted in making its ruling. Therefore, counsel's performance was not objectively unreasonable and we agree with second appointed appellate counsel that this potential issue is without merit.

¶ 54    We turn now to the remaining two potential issues: (1) that the trial court erred in finding that Brenda R failed to maintain a reasonable degree of interest, concern, and responsibility towards C.G.; and (2) that the trial court erred in determining that termination of Brenda R.'s parental rights was in C.G.'s best interest.

¶ 55    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) lays out a two-step process for termination of parental rights. First, the State must prove by clear and convincing evidence that the parent is unfit. *In re Kenyon R.*, 2017 IL App (2d) 160657, ¶ 16. Section 1(D) of

the Act lays out 22 potential grounds for unfitness. 705 ILCS 50/1(D) (West 2020). A single ground of unfitness is sufficient to support a finding of unfitness. *In re Kenyon R.*, 2017 IL App (2d) 160657, ¶ 16. Second, once the trial court has found a parent unfit, the State must prove by a preponderance of the evidence, whether it is in the minor's best interests to terminate parental rights. *Id.* A trial court's findings regarding parental unfitness or the best interests of a child will not be disturbed unless they are against the manifest weight of the evidence. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 32. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30 (quoting *In re Kenyon R.*, 2017 IL App (2d) 160657, ¶ 22).

¶ 56    Here, second appointed counsel focused on evaluating paragraph 7a of the State's petition for termination—that she failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, pursuant to 750 ILCS 50/1(D)(b). We agree with counsel that any challenge to this finding would be frivolous. Brenda was inconsistent with visitation and often tested positive for illicit substances or missed drops. Despite the case proceeding for nearly three-and-a-half years, she was unable to ever fully complete services, progress towards unsupervised visitation, or maintain her sobriety.

¶ 57    Further, a single ground of unfitness is sufficient to support a finding of unfitness. *In re Kenyon R.*, 2017 IL App (2d) 160657, ¶ 16. Even if the trial court erred in finding that Brenda did not maintain a reasonable degree of interest, concern, and responsibility towards C.G., there were three other unfitness findings: that she failed to protect the child from conditions within her environment injurious to the child's welfare, pursuant to 750 ILCS 50/1(D)(g); that she has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the

child from such parent, or to make reasonable progress toward the return of the child to such parent, during the nine (9) month period from April 16, 2021 through January 16, 2022, after an adjudication of neglect and abuse under the Juvenile Court Act, pursuant to 750 ILCS 50/1(D)(m); and that she has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent, during the nine (9) month period from January 17, 2022 through October 17, 2022, after an adjudication of neglect and abuse under the Juvenile Court Act, pursuant to 750 ILCS 50/1(D)(m).

¶ 58    Looking specifically at the two nine-month periods, April 16, 2021, through January 16, 2022, and January 17, 2022, through October 17, 2022, we cannot find that the trial court's finding that she failed to make reasonable efforts or progress was against the manifest weight of the evidence. In the period of April 16, 2021, through January 16, 2022, she missed a drop in December 2021 and admitted to taking ecstasy. She did not regularly visit C.G. She failed to complete the substance abuse evaluation or parent coaching. At each and every permanency hearing, Brenda was admonished as to what services needed completion, as well as how important completion of all services was for reunification. Despite this, Brenda testified that she did not know what services she needed to do in the initial 18 months of the case because no one had ever corresponded with her regarding a service plan. Given the above, we do not find that the trial court's finding that Brenda failed to make reasonable efforts or progress between April 16, 2021, and January 16, 2022, was against the manifest weight of the evidence.

¶ 59    In the period of January 17, 2022, through October 17, 2022, Brenda was picked up on an outstanding warrant in March 2022. She also tested positive for methamphetamines on March 15, 2022. Brenda failed to keep her home in an appropriate state, as evidenced by DCFS visitations

occurring on March 24, 2022, and April 13, 2022. She also misused her benzodiazepine during this time. Brenda did complete a domestic violence consultation during this period, but did not follow through with the recommendations. Given the above, we do not find that the trial court's finding that Brenda failed to make reasonable efforts or progress between January 17, 2022, and October 17, 2022, was against the manifest weight of the evidence.

¶ 60    Lastly, we address the trial court's best interests finding. Although counsel's analysis regarding this potential issue is lacking, we do still agree that any challenge to the best interests finding would be meritless. The trial court considered all the statutory factors outlined in 705 ILCS 405/1-3(4.05) (West 2024). C.G. had been with her foster father for approximately three-and-a-half years and was thriving in his care. This was supported by the CASA GAL best interests report and Nicholas Nasuta's testimony. Accordingly, the trial court's best interests finding was not against the manifest weight of the evidence.

¶ 61    As a closing note, it is clear that Brenda cares deeply for C.G., as the trial court noted. However, this does not change the fact that the trial court's termination of her parental rights was appropriate. The interests of finality and judicial economy require that at some point, a line must be drawn in terminating parental rights. *In re Alexa J.*, 345 Ill. App. 3d at 990 (citing *In re Abdullah*, 85 Ill. 2d 300, 310). The trial court appropriately drew that line, and second appointed counsel is correct in concluding that Brenda's appeal presents no issues of arguable merit.

¶ 62                                III. CONCLUSION

¶ 63    After reviewing the record, the motion to withdraw, and the supporting memorandum of law, we agree that respondent's appeal presents no issues of arguable merit. Accordingly, we grant the motion to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 64    Motion granted; affirmed.